PAUL ANDRE (State Bar No. 196585)
pandre@kramerlevin.com
LISA KOBIALKA (State Bar No. 191404)
lkobialka@kramerlevin.com
JAMES HANNAH (State Bar No. 237978)
jhannah@kramerlevin.com
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
Telephone: (650) 752-1700
Facsimile: (650) 752-1800

*Attorneys for Plaintiff*
FINJAN, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FINJAN, INC., a Delaware Corporation,<br><br>       Plaintiff,<br><br>   v.<br><br>CISCO SYSTEMS, INC., a California Corporation,<br><br>       Defendant. | Case No.: 5:17-CV-00072-BLF<br><br>**SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

**SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Finjan, Inc. ("Finjan") files this First Amended Complaint for Patent Infringement and Demand for Jury Trial against Cisco Systems, Inc. ("Defendant" or "Cisco") and allege as follows:

**THE PARTIES**

1.     Finjan is a Delaware Corporation, with its principal place of business at 2000 University Avenue, Suite 600, E. Palo Alto, California 94303.

2.     Cisco is a California Corporation with its principal place of business at 170 West Tasman Drive, San Jose, California 95134.  Cisco may be served through its agent for service of process CSC at 2710 Gateway Oaks Dr. Ste. 150N, Sacramento, California 95833.

**JURISDICTION AND VENUE**

3.     This action arises under the Patent Act, 35 U.S.C. § 101 *et seq*.  This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).

5.     This Court has personal jurisdiction over Cisco.  Upon information and belief, Cisco does business in this District and have, and continues to, infringe and/or induce the infringement in this District.  In addition, the Court has personal jurisdiction over Cisco because minimum contacts have been established with the forum and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

**INTRADISTRICT ASSIGNMENT**

6.     Pursuant to Local Rule 3-2(c), Intellectual Property Actions are assigned on a district-wide basis.

**FINJAN'S INNOVATIONS**

7.     Finjan was founded in 1997 as a wholly-owned subsidiary of Finjan Software Ltd., an Israeli corporation.  In 1998, Finjan moved its headquarters to San Jose, California.  Finjan was a pioneer in developing proactive security technologies capable of detecting previously unknown and emerging online security threats recognized today under the umbrella of "malware."  These technologies protect networks and endpoints by identifying suspicious patterns and behaviors of

1

content delivered over the Internet.  Finjan has been awarded, and continues to prosecute, numerous patents covering innovations in the United States and around the world resulting directly from Finjan's more than decades-long research and development efforts, supported by a dozen inventors, and over $65 million in R&D investments.

8.     Finjan built and sold software, including application program interfaces (APIs), and appliances for network security using these patented technologies.  These products and related customers continue to be supported by Finjan's licensing partners.  At its height, Finjan employed nearly 150 employees around the world building and selling security products and operating the Malicious Code Research Center through which it frequently published research regarding network security and current threats on the Internet.  Finjan's pioneering approach to online security drew equity investments from two major software and technology companies, the first in 2005, followed by the second in 2006.  Finjan generated millions of dollars in product sales and related services and support revenues through 2009 when it spun off certain hardware and technology assets in a merger.  Pursuant to this merger, Finjan was bound to a non-compete and confidentiality agreement, under which it could not make or sell a competing product or disclose the existence of the non-compete clause.  Finjan became a publicly traded company in June 2013, capitalized with $30 million.  After Finjan's obligations under the non-compete and confidentiality agreement expired in March 2015, Finjan re-entered the development and production sector of secure mobile products for the consumer market.

9.     On November 28, 2000, U.S. Patent No. 6,154,844 ("the '844 Patent"), titled SYSTEM AND METHOD FOR ATTACHING A DOWNLOADABLE SECURITY PROFILE TO A DOWNLOADABLE, was issued to Shlomo Touboul and Nachshon Gal.  A true and correct copy of the '844 Patent is attached to this Complaint as Exhibit 1 and is incorporated by reference herein.

10.     All rights, title, and interest in the '844 Patent have been assigned to Finjan, who is the sole owner of the '844 Patent.  Finjan has been the sole owner of the '844 Patent since its issuance.

11.     The '844 Patent is generally directed towards computer networks, and more particularly, provides a system that protects devices connected to the Internet from undesirable

SECOND AMENDED COMPLAINT FOR                     CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

operations from web-based content.  One of the ways this is accomplished is by linking a security profile to such web-based content to facilitate the protection of computers and networks from malicious web-based content.

12.     On October 12, 2004, U.S. Patent No. 6,804,780 ("the '780 Patent"), titled SYSTEM AND METHOD FOR PROTECTING A COMPUTER AND A NETWORK FROM HOSTILE DOWNLOADABLES, was issued to Shlomo Touboul.  A true and correct copy of the '780 Patent is attached to this Complaint as Exhibit 2 and is incorporated by reference herein.

13.     All rights, title, and interest in the '780 Patent have been assigned to Finjan, who is the sole owner of the '780 Patent.  Finjan has been the sole owner of the '780 Patent since its issuance.

14.     The '780 Patent is generally directed towards methods and systems for generating a Downloadable ID.  By generating an identification for each examined Downloadable, the system may allow for the Downloadable to be recognized without reevaluation.  Such recognition increases efficiency while also saving valuable resources, such as memory and computing power.

15.     On January 12, 2010, U.S. Patent No. 7,647,633 ("the '633 Patent"), titled MALICIOUS MOBILE CODE RUNTIME MONITORING SYSTEM AND METHODS, was issued to Yigal Mordechai Edery, Nimrod Itzhak Vered, David R. Kroll, and Shlomo Touboul.  A true and correct copy of the '633 Patent is attached to this Complaint as Exhibit 3 and is incorporated by reference herein.

16.     All rights, title, and interest in the '633 Patent have been assigned to Finjan, who is the sole owner of the '633 Patent.  Finjan has been the sole owner of the '633 Patent since its issuance.

17.     The '633 Patent is generally directed towards computer networks and, more particularly, provides a system that protects devices connected to the Internet from undesirable operations from web-based content.  One of the ways this is accomplished is by determining whether any part of such web-based content can be executed and then trapping such content and neutralizing possible harmful effects using mobile protection code.

18.     On March 20, 2012, U.S. Patent No. 8,141,154 ("the '154 Patent"), titled SYSTEM AND METHOD FOR INSPECTING DYNAMICALLY GENERATED EXECUTABLE CODE, was

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

issued to David Gruzman and Yuval Ben-Itzhak.  A true and correct copy of the '154 Patent is attached to this Complaint as Exhibit 4 and is incorporated by reference herein.

19.     All rights, title, and interest in the '154 Patent have been assigned to Finjan, who is the sole owner of the '154 Patent.  Finjan has been the sole owner of the '154 Patent since its issuance.

20.     The '154 Patent is generally directed towards a gateway computer protecting a client computer from dynamically generated malicious content.  One way this is accomplished is to use a content processor to process a first function and invoke a second function if a security computer indicates that it is safe to invoke the second function.

21.     On March 18, 2014, U.S. Patent No. 8,677,494 ("the '494 Patent"), titled MALICIOUS MOBILE CODE RUNTIME MONITORING SYSTEM AND METHODS, was issued to Yigal Mordechai Edery, Nimrod Itzhak Vered, David R. Kroll, and Shlomo Touboul.  A true and correct copy of the '494 Patent is attached to this Complaint as Exhibit 5 and is incorporated by reference herein.

22.     All rights, title, and interest in the '494 Patent have been assigned to Finjan, who is the sole owner of the '494 Patent.  Finjan has been the sole owner of the '494 Patent since its issuance.

23.     The '494 Patent is generally directed towards a method and system for deriving security profiles and storing the security profiles.  The claims generally cover deriving a security profile for a downloadable, which includes a list of suspicious computer operations, and storing the security profile in a database.

## CISCO

24.     Cisco makes, uses, sells, offers for sale, and/or imports into the United States and this District products and services that utilize Cisco's Advanced Malware Protection ("AMP"), Cisco Collective Security Intelligence ("CCSI"), Cisco Outbreak Filters, Talos Security Intelligence and Research Group ("Talos"), and AMP Threat Grid technologies, including Cisco AMP for Endpoints, Cisco AMP for Networks (also referred to by Cisco as "NGIPS"), Cisco AMP for ASA with FirePOWER Services, Cisco AMP Private Cloud Virtual Appliance, Cisco AMP for CWS, ESA, or WSA, Cisco AMP for Meraki MX, Cisco AMP Threat Grid (collectively, "Accused AMP Products").

4

1   *See* https://www.cisco.com/c/dam/en/us/solutions/collateral/enterprise-networks/advanced-malware-

2   protection/at-a-glance-c45-731876.pdf, attached hereto as Exhibit 6.

3           25.     Cisco AMP for Endpoint products operate on multiple operating systems, including

4   Windows, Mac OS, Linux, and Android, as described in

5   http://www.cisco.com/c/en/us/products/collateral/security/fireamp-endpoints/datasheet-c78-

6   733181.html, attached hereto as Exhibit 7.

7           26.     Cisco AMP for Networks products include AMP7150, AMP8050, AMP8150,

8   AMP8350, AMP8360, AMP8370, and AMP8390, as described in

9   http://www.cisco.com/c/en/us/products/collateral/security/amp-appliances/datasheet-c78-733182.html,

10  attached hereto as Exhibit 8.

11          27.     Cisco AMP for ASA with FirePOWER Services products include Cisco ASA 5506-X,

12  Cisco ASA 5506W-X, Cisco ASA 5506H-X, Cisco ASA 5508-X, Cisco ASA 5516-X, Cisco ASA

13  5512-X, Cisco ASA 5515-X, Cisco ASA 5525-X, Cisco ASA 5545-X, Cisco ASA 5555-X, Cisco

14  ASA 5585-X SSP-10, Cisco ASA 5585-X SSP-20, Cisco ASA 5585-X SSP-40, Cisco ASA 5585-X

15  SSP-60, Cisco ASA 5585-X SSP EP 10/40, and Cisco ASA 5585-X SSP EP 20/60, as described in

16  http://cisco-apps.cisco.com/c/en/us/products/collateral/security/asa-5500-series-next-generation-

17  firewalls/datasheet-c78-733916.html, attached hereto as Exhibit 9.

18          28.     Cisco AMP Private Cloud Virtual Appliance products are AMP Private Cloud 2.0, as

19  described in http://www.cisco.com/c/en/us/products/collateral/security/fireamp-private-cloud-virtual-

20  appliance/datasheet-c78-733180.html, attached hereto as Exhibit 10.

21          29.     Cisco AMP for CWS includes Cloud Web Security Essentials, Cloud Web Security

22  Premium license, Advanced Threat Detection, Cisco AMP license, and Web Security bundle, as

23  described in http://www.cisco.com/c/en/us/products/collateral/security/cloud-web-

24  security/data_sheet_c78-729637.html, attached hereto as Exhibit 11.

25          30.     Cisco AMP for ESA products include ESA C690, ESA C690X, ESA C680, ESA C390,

26  ESA C380, ESA C190, ESA C170, ESAV C100v, ESAV C300v, ESAV C600v, SMA

27  M690/690X/680, SMA M390/380 and SMA M190/170, as described in

28

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

http://www.cisco.com/c/en/us/products/collateral/security/email-security-appliance/data-sheet-c78-729751.html, attached hereto as Exhibit 12.

31.     Cisco AMP for WSA products include S690, S690X, S680, S390, S380, S190, S170, WSAV S000v, WSAV S100v, WSAV S300v, M680, M380, and M170, as described in http://www.cisco.com/c/en/us/products/collateral/security/content-security-management-appliance/datasheet-c78-729630.html, attached hereto as Exhibit 13.

32.     Cisco AMP for Meraki MX is included with Meraki MX products that have the MX Advanced Security License, including MX64, MX64W, MX65, MX65W, MX84, MX100, MX400, MX600, as described in http://blogs.cisco.com/security/cisco-meraki-mx-with-amp-threat-grid, https://meraki.cisco.com/products/appliances#models and https://meraki.cisco.com/amp?utm_source=overview%20features&utm_medium=overview&utm_campaign=AMP%20launch%202016, attached hereto as Exhibits 14-16.

33.     Cisco AMP Threat Grid products include Cisco AMP Threat Grid 5000, Cisco AMP Threat Grid 5500, AMP Threat Grid portal, and AMP Threat Grid dynamic analysis, as described in http://www.cisco.com/c/en/us/products/collateral/security/amp-threat-grid-appliances/datasheet-c78-733667.html and http://www.cisco.com/c/en/us/products/collateral/security/amp-threat-grid-cloud/datasheet-c78-733495.html, attached hereto as Exhibits 17-18.

34.     In addition, Cisco makes, has made, uses, sells, offers for sale, and/or imports into the United States and this District the Talos service that detects, analyzes and protects against both known and emerging threats, utilizing systems that create threat intelligence for Cisco products (collectively, "Accused Talos Service"), as described in http://blogs.cisco.com/author/talos, attached hereto as Exhibit 19.

35.     Further, Cisco makes, has made, uses, sells, offers for sale, and/or imports into the United States and this District products and services that utilize Cisco's Outbreak Filters (also known as IronPort Outbreak Filters) with Talos, including Cisco's ESA appliances: ESA C690, ESA C690X, ESA C680, ESA C390, ESA C380, ESA C190, ESA C170, ESAV C100v, ESAV C300v, ESAV C600v, SMA M690/690X/680, SMA M390/380 and SMA M190/170 (collectively, "Accused

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

Outbreak Filter Products"), as described in

http://www.cisco.com/c/en/us/products/collateral/security/email-security-appliance/data-sheet-c78-729751.html, attached hereto as Exhibit 20.

**Talos**

36.     Talos Security Intelligence and Research Group ("Talos") was created by combining SourceFire's Vulnerability Research Team, the Cisco Threat Research and Communications group, and the Cisco Security Applications Group.  Talos is also a part of the Cisco Security Intelligence Operations ("SIO") and primary member of Cisco's Collective Security Intelligence ecosystem ("CSI").  Talos detects and correlates threats in real time using a threat detection network spanning web, email, malware samples, open source data sets, endpoint intelligence, and network intrusions. Talos encompasses five key areas, including Detection Research, Threat Intelligence, Engine Development, Vulnerability Research and Development, and Outreach.  Detection Research consists of vulnerability and malware analyses that lead to the development of detection content for all Cisco's security products.  Threat Intelligence consists of correlating and tracking threats in order to turn attribution information into actionable threat intelligence.  Engine Development ensures various inspection engines stay current and maintain their ability to detect and address emerging threats. Vulnerability Research and Development develops ways to identify "Zero-Day" security issues on platforms and operating systems.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT



*See* http://www.talosintelligence.com/files/about/Talos_WhitePaper.v3.20160507.pdf, attached hereto as Exhibit 21.

37.    SIO is an advanced security infrastructure that provides threat identification, analysis, and mitigation to continuously provide security for Cisco customers.  Cisco devices, whether on premise or cloud appliance based, act as the enforcement points in this ecosystem – they use Cisco SIO filters and reputation data to block or allow traffic.  The devices also contribute threat intelligence and data back into Cisco SIO.  Cisco SIO's dynamic updates deliver current and complete security information to Cisco customers and devices.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

Cisco Security Intelligence Operations (SIO) provides near-real-time global threat information with early-warning intelligence, threat and vulnerability analysis, and proven Cisco mitigation solutions to help protect networks.

SIO starts with the network as the platform for security – with SIO being firmly rooted in all of our security appliances, whether they are firewall, IPS, web, email, and even VPN on the endpoint. Each of these platforms protects organizations and users and feeds into a global network of sensors.



*See* http://blogs.cisco.com/ciscoit/cisco-security-intelligence-operations-defense-in-depth, attached hereto as Exhibit 22.

      38.     As shown below, the Talos service includes advanced and dynamic analyses.

9

SECOND AMENDED COMPLAINT FOR          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT



*See* http://ciscoday.me/pdf/Cisco%20AMP%20Sasa%20Milic%20Asseco.pdf, attached hereto as Exhibit 23.

### **AMP**

39.     Cisco AMP uses Cisco's Collective Security Intelligence cloud to obtain real-time file dispositions across multiple attack vectors, like web and email.  This includes using Cisco Talos to push threat intelligence to the AMP network.  Known malicious files are blocked from reaching their target systems.  Files with an unknown dispositions are automatically submitted to the Threat Grid threat intelligence and malware analysis engine for analyses.  A threat score is computed for analyzed files and a detailed threat report from Threat Grid is available to aid in decision making.   AMP has many variations, including AMP for Endpoints, AMP for Networks, AMP for Firewalls, AMP for ISR, AMP for Web, AMP for E-mail, AMP Private Cloud Virtual Appliance, and Threat Grid.

40.     Additionally, the Cisco AMP solution uses an extensive infrastructure of sandboxes to analyze hundreds of thousands of files each day.  The Cisco sandboxes detonate files in a safe environment and record its actions.  This analysis results in a detained report about the file's disposition (including details regarding major indicators of malicious behavior), potential impact on an

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

environment, suspicious activity, dynamically linked libraries, indicators of compromise, network

activity, and files that may have spawned or dropped.



*See* http://s2.q4cdn.com/230918913/files/doc_presentations/doc_events/David-

Goeckeler_Cisco_Live-Investor_6_8_15_v10_post-legal.pdf, attached hereto as Exhibit 24.



SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

*See* https://www.cisco.com/web/offer/emear/38586/images/Presentations/P17.pdf, attached hereto as Exhibit 25.

### Threat Grid

41.    AMP Threat Grid (both Cloud and Appliance), which crowd sources malware and analyzes all samples using proprietary, utilizes highly secure techniques that include static and dynamic (sandboxing) analysis.  AMP Threat Grid analyzes suspicious behavior against more than 450 behavioral indicators.  It correlates the results with hundreds of millions of other analyzed malware to provide a global view of malware attacks, campaigns, and their distributions.  This ability helps analysts effectively defend against both targeted attacks and the broader threats from advanced malware.  AMP Threat Grid's detailed reports include the identification of important behavioral indicators and the assignment of threat scores.  Using the behavioral indicators, AMP Threat Grid determines whether a sample is malicious, suspicious, or benign, and why.



*See* http://www.cisco.com/c/dam/global/da_dk/assets/pdfs/AMP-Threat-Grid.pdf, attached hereto as Exhibit 26.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

*See* http://www.cisco.com/c/dam/global/en_ca/assets/pdfs/amp-everywhere-deployment-infographic-white.pdf, attached hereto as Exhibit 27.

**Outbreak Filters**

42.     Cisco Outbreak Filters protect systems against new outbreaks of viruses and other malware delivered via attachments by scanning uniform resource locators ("URLs") and processing them in real time—as the user opens them—to block malicious sites.  The Cisco Outbreak Filters can also rewrite URLs.  Additionally, these filters send data about the websites to Talos to protect all users of Cisco security products, including Cisco's firewall, web security, and intrusion prevention products.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT



**Figure 1.** A simple flow of Cisco Outbreak Filters

1. An incoming email is scanned by Outbreak Filters. The refined rule set identifies this as a potential phishing or targeted attack email and handles it as configured on the appliance. By default, a disclaimer is prepended to the email text identifying it as a phish and the URL contained in the email is rewritten.

2. The email with the rewritten url is delivered to the user's inbox.

3. If opened, this rewritten email link sends the user to a public proxy where the webpage content is intercepted and scanned in the cloud in real time using Outbreak Intelligence.

4. If malware is detected on the page, a blocked page message is served up to the user and information about the URL is passed from the cloud back to Cisco Talos. Otherwise, the user is given a choice: surf the page through the proxy or go directly to the site.

*See* http://www.cisco.com/c/en/us/products/collateral/security/email-security-appliance/white_paper_c11-684611.html at 2, attached hereto as Exhibit 28.

43.    Cisco Outbreak Filters use deep content analysis via Outbreak Intelligence processes that look for malicious web content.  The content is scanned using multiple proprietary scanning engines for Flash, Java, PDF, archives, executables, file anomalies and more. Additionally, virtual script emulation is used where the script is run within the cloud infrastructure allowing for monitoring of malicious behavior such as a hidden redirect or drive-by download.  If malicious behavior is detected, the script is blocked, preventing it from passing onto the end user.

## CISCO'S INFRINGEMENT OF FINJAN'S PATENTS

44.    Cisco has been and is now infringing, and will continue to infringe the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent (collectively "the Patents-In-Suit") in this judicial District and elsewhere in the United States by, among other things, making, using, importing, selling, and/or offering for sale the claimed system and methods on the Accused AMP Products, Accused Talos Service, and Accused Outbreak Filter Products.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

45.     In addition to directly infringing the Patents-In-Suit pursuant to 35 U.S.C. § 271(a), either literally or under the doctrine of equivalents, or both, Cisco indirectly infringe all the Patents-In-Suit by instructing, directing and/or requiring others, including its customers, purchasers, users, and developers, to perform all or some of the steps of the method claims, either literally or under the doctrine of equivalents, or both, of the Patents-In-Suit.

46.     In addition, Cisco has willfully infringed each of the Patents-in-Suit.  Cisco had knowledge of each of the Patents-in-Suit before this lawsuit was filed and has engaged in egregious behavior warranting enhanced damages.

47.     Finjan and Cisco's relationship dates back over two decades.  Throughout the years, until the time that Cisco began infringing Finjan's patents, Cisco and Finjan maintained an amicable relationship and consistently collaborated together on cybersecurity.  In the late 1990's, the parties entered into an original equipment manufacturer agreement that allowed Cisco to incorporate Finjan's technology into Cisco's products.  As early as this time, Cisco saw the value of Finjan's technology. Cisco explicitly acknowledged in a 1997 Fortune Magazine article that "discussions with Finjan brought it to the 'watershed decision' to include content inspection in its security products," and that Cisco has "very high regard for Finjan and its technology."

48.     Beginning as early as 2004, Cisco made multiple substantial financial investments in Finjan.  At the time of these investments, Cisco knew of Finjan's patent portfolio and patented technology.  For example, on or about June 2, 2004, Finjan and Cisco entered into a Series D Preferred Stock Purchase Agreement, which specifically identified and described the '844 Patent and the application that resulted in the '780 Patent.  Thus, Cisco knew of the '844 Patent and the pending application for the '780 Patent at least as early as June 2, 2004.  The same agreement authorized Cisco to send one non-voting representative to all Finjan Board of Directors meetings.  As a further example, on or about November 14, 2008, Finjan and Cisco entered into a Series E Preferred Stock Purchase Agreement, which specifically identified and described the '844 and '780 Patents and the application that resulted in the '633 Patent.  Thus, Cisco knew of the '780 Patent and the pending application for the '633 Patent at least as early as November 14, 2008.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

49.     Cisco continued to gain knowledge about Finjan and its patents and patented technology after investing in Finjan.  For example, in or around December 2006, Finjan gave a presentation to Cisco titled "Introducing Finjan Vital Security" that discussed Finjan's patents and described in detail the technology covered by the '844 and '780 Patents and Finjan's products that practiced that technology.  Furthermore, in or around 2005, Cisco had an observer, Cisco's then-Vice President of Corporate Development, Yoav Samet, attend Finjan's board of director meetings during which Finjan's patents, technology and business were discussed.

50.     In addition, since at least June 2013 when Finjan became a public company, Cisco has been a Beneficial Owner of Finjan, owning 7.5% of Finjan Holdings, Inc.'s common stock and holding voting power continuously.  Thus, Cisco has further gained knowledge of Finjan's patents as a Beneficial Owner.  For example, Cisco has known of the '633 Patent and '154 Patent since at least on or about March 14, 2014, when Finjan Holdings, Inc. published its Annual Report for investors, which included Cisco.  This Annual Report specifically identified and described the '844 Patent, '780 Patent, '633 Patent and '154 Patent and the pending lawsuits Finjan had filed against third parties for infringement of these patents.  Cisco has also had knowledge of the '494 Patent since at least on or about May 8, 2014 when Finjan Holdings, Inc. published its Quarterly Report for investors, which included Cisco.   This Quarterly Report specifically identified and described the '844 Patent, '780 Patent, '633 Patent, '154 Patent and '494 Patent and the pending lawsuits Finjan had filed against third parties for infringement of these patents.

51.     Despite the foregoing knowledge of the '844, '780, '633, '154 and '494 Patents and the technology covered by these patents, and despite a high likelihood that its actions constituted infringement of these patents, Cisco proceeded to and continued to infringe these patents.  Specifically, Cisco acquired technology that infringes each of the Patents-in-Suit from Sourcefire, Inc. ("SourceFire") in or around October 2013, integrated that company's appliances and technology into its own product lines and has continued with its infringing conduct since that time.  Also, at least as early as March 2012, Cisco integrated into its products Outbreak Filters, which infringe the '154 Patent, and has continued with its infringing conduct since.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

52.     Cisco's infringement of the '844 Patent, '780 Patent, '633 Patent, '154 Patent and '494 Patent is egregious.  Cisco and Finjan had been in a long and extensive collaborative working relationship for almost twenty years during which Cisco had "very high regard for Finjan and its technology."  As described above, from at least as early as 2004 until 2014, Cisco gained knowledge of each of the Patents-in-Suit and the technology they cover.  Based on information obtained from Finjan concerning Finjan's patents and technology, Cisco continuously invested in Finjan since at least as early as 2004.  Finjan and Cisco maintained an amicable and collaborative relationship over the course of these years, in which Cisco's representative even attended multiple Finjan board meetings where Finjan's information, including its patents, technology and business strategy, was discussed.  As such, Cisco recognized and valued Finjan's patents, including the '844 Patent, '780 Patent, '633 Patent, '154 Patent and '494 Patent, and it desired to have this patented technology incorporated into its own products and services.  Thus, in violation of the relationship of trust and collaboration for approximately twenty years in which Cisco led Finjan to believe it was a partner, Cisco made the deliberate decision to acquire and to continue to sell products and services that it knew infringe Finjan's Patents-in-Suit.

53.     On information and belief, Cisco has undertaken no efforts to design these products or services around the '844 Patent, '780 Patent, '633 Patent, '154 Patent or '494 Patent to avoid infringement despite Cisco's knowledge and understanding that its products and services infringe these patents.  Thus, Cisco's infringement of the '844 Patent, '780 Patent, '633 Patent, '154 Patent and '494 Patent is willful and egregious, warranting enhancement of damages.

## COUNT I
### (Direct Infringement of the '844 Patent pursuant to 35 U.S.C. § 271(a))

54.     Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

55.     Cisco has infringed and continues to infringe Claims 1-44 of the '844 Patent in violation of 35 U.S.C. § 271(a).

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

56.     Cisco's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

57.     Cisco's acts of making, using, importing, selling, and/or offering for sale infringing products and services have been without the permission, consent, authorization, or license of Finjan.

58.     Cisco's infringement includes the manufacture, use, sale, importation and/or offer for sale of Cisco's products and services, including the Cisco AMP for Endpoints, Cisco AMP for Networks, Cisco AMP for ASA with FirePOWER Services, Cisco AMP Private Cloud Virtual Appliance, Cisco AMP for CWS, ESA, or WSA, Cisco AMP for Meraki MX, Cisco AMP Threat Grid (i.e., the Accused AMP Products), and the Accused Talos Service (collectively, the "'844 Accused Products").

59.     The '844 Accused Products embody the patented invention of the '844 Patent and infringe the '844 Patent because they practice a method of receiving by an inspector a downloadable, generating by the inspector a first downloadable security profile that identifies suspicious code in the received downloadable and linking by the inspector the first downloadable security profile to the downloadable before a web server makes the downloadable available to web clients.  For example, as shown below, Cisco AMP for Networks, provides gateway security to end users.



SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

*See* http://ftp.cisco.cz/Seminare/2013-ConnectClub/2014-05-28-AMP-GyorgyAcs.pdf, attached hereto as Exhibit 29.

60.     Incoming downloadables are received at the '844 Accused Products, whether the downloadables are either scanned locally or submitted for analytics and reputation determination.  As shown below, using advanced heuristics, a downloadable security profile is created and linked if the downloadable is unknown.



*See* http://ftp.cisco.cz/Seminare/2013-ConnectClub/2014-05-28-AMP-GyorgyAcs.pdf, attached hereto as Exhibit 29.

As shown below, a list of suspicious operations is collected.

SECOND AMENDED COMPLAINT FOR                          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

| |
|---|
| Binary contains device paths (device paths are often used for kernelmode <-> usermode communication) |
| Binary contains paths to debug symbols |
| Creates files inside the user directory |
| Creates temporary files |
| Printf formatting strings found in memory and binary data |
| Queries a list of all running drivers |
| Queries a list of all running processes |
| Reads ini files |
| Spawns processes |
| Urls found in memory or binary data |
| Binary may include packed or crypted data |
| Creates an autostart registry key |
| Creates driver files |
| Creates files inside the system directory |
| Drops PE files |
| Entrypoint lies outside standard sections |
| Found strings which match to known social media urls |
| May tried to detect the virtual machine to detect the environment (VM Detection) |
| PE file contains sections with non-standard names |
| PE sections with suspicious entropy found |
| Performs DNS lookups |
| Spawns drivers |
| AV process strings found (often used to terminate AV products) |
| Contains capabilities to detect virtual machines |
| Deletes Windows files |
| Deletes keys which are related to windows safe boot (disables safe mode boot) |
| Hooks files or directories query functions (used to hide files and directories) |
| Hooks processes query functions(used to hide processes) |
| Hooks registry keys query functions (used to hide registry keys) |
| Modifies the system service dispatch table (places SSDT hooks) |

*See* http://ftp.cisco.cz/Seminare/2013-ConnectClub/2014-05-28-AMP-GyorgyAcs.pdf, attached hereto as Exhibit 29.

61.    The Accused AMP Products use the Talos Service and other systems to create a downloadable security profile.  Similarly, the Accused Talos Service also generates a downloadable security profile for unknown downloadables.

62.    As a result of Cisco's unlawful activities, Finjan has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Finjan is entitled to preliminary and/or permanent injunctive relief.

63.    Cisco's infringement of the '844 Patent has injured and continues to injure Finjan in an amount to be proven at trial.

64.    Cisco has been well aware of Finjan's patents, including the '844 Patent, and has continued its infringing activity despite this knowledge.  Finjan and Cisco's relationship dates back over two decades.  Throughout the years, until the time that Cisco began infringing Finjan's patents, Cisco and Finjan maintained an amicable relationship and consistently collaborated together on cybersecurity.  In the late 1990's, the parties entered into an original equipment manufacturer

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

1   agreement that allowed Cisco to incorporate Finjan's technology into Cisco's products.  As early as

2   this time, Cisco saw the value of Finjan's technology.  Cisco explicitly acknowledged in a 1997

3   Fortune Magazine article that "discussions with Finjan brought it to the 'watershed decision to include

4   content inspection in its security products," and that Cisco has "very high regard for Finjan and its

5   technology."

6        65.    Cisco knew of the '844 Patent at least as early as June 2, 2004.  For example, on or

7   about June 2, 2004, Finjan and Cisco entered into a Series D Preferred Stock Purchase Agreement,

8   which specifically identified and described the '844 Patent.  Also, in or around 2005, Cisco had an

9   observer, Cisco's then-Vice President of Corporate Development, Yoav Samet, attend Finjan's board

10  of director meetings, during which Finjan's patents and technology were discussed.  Also, in or around

11  December 2006, Finjan gave a presentation to Cisco titled "Introducing Finjan Vital Security" that

12  discussed Finjan's patents and described in detail the technology covered by the '844 Patent and

13  Finjan's products that practiced that technology.  In addition, on or about November 14, 2008, Finjan

14  and Cisco entered into a Series E Preferred Stock Purchase Agreement which specifically identified

15  and described the '844 Patent.  Also, on or about March 14, 2014, Finjan Holdings, Inc. published its

16  Annual Report for investors, including Cisco, which specifically identified the '844 Patent and pending

17  lawsuits Finjan filed against various third parties for infringement of this patent.  Cisco has been one of

18  the Beneficial Owners of Finjan, owning 7.5% of Finjan Holdings, Inc.'s common stock and holding

19  voting power continuously at least since June 2013 when Finjan became a public company.

20       66.    Despite the foregoing knowledge of the '844 Patent and the technology covered by this

21  patent, and despite a high likelihood that its actions constituted infringement of this patent, Cisco

22  proceeded to and continued to infringe the '844 Patent.  Specifically, Cisco acquired technology that

23  infringes the '844 Patent from Sourcefire in or around October 2013, integrated that company's

24  appliances and technology into its own product lines and has continued with its infringing conduct

25  since that time.

26       67.    Cisco's infringement of the '844 Patent is egregious.  Cisco and Finjan had been in a

27  long and extensive collaborative working relationship for almost twenty years during which Cisco had

28

SECOND AMENDED COMPLAINT FOR          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

"very high regard for Finjan and its technology."  From at least as early as 2004, Cisco gained knowledge of the '844 Patent and the technology it covers.  Based on information obtained from Finjan concerning Finjan's patents and technology, Cisco continuously invested in Finjan since at least as early as 2004.  Finjan and Cisco maintained an amicable and collaborative relationship over the course of these years, in which Cisco's representative even attended multiple Finjan board meetings where Finjan's information, including its patents, technology and business strategy, was discussed.  As such, Cisco recognized and valued Finjan's patents, including the '844 Patent, and it desired to have this patented technology incorporated into its own products and services.  Thus, in violation of the relationship of trust and collaboration for approximately twenty years in which Cisco led Finjan to believe it was a partner, Cisco made the deliberate decision to acquire and to continue to sell products and services that it knew infringed the '844 Patent.

68.    On information and belief, Cisco has undertaken no efforts to design these products or services around the '844 Patent to avoid infringement despite Cisco's knowledge and understanding that its products and services infringe the '844 Patent.  Thus, Cisco's infringement of the '844 Patent is willful and egregious, warranting enhancement of damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT II
### (Indirect Infringement of the '844 Patent pursuant to 35 U.S.C. § 271(b))

69.    Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

70.    Cisco has induced and continues to induce infringement of one or more claims of the '844 Patent under 35 U.S.C. § 271(b).

71.    In addition to directly infringing the '844 Patent, Cisco indirectly infringes the '844 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including its customers, purchasers, users, and developers, to perform one or more of the steps of the method claims, either literally or under the doctrine of equivalents, of the '844 Patent, where all the steps of the method claims are performed by either Cisco, its customers, purchasers, users or developers, or some

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

combination thereof.  Cisco knew or was willfully blind to the fact that it was inducing others, including customers, purchasers, users or developers, to infringe by practicing, either themselves or in conjunction with Cisco, one or more method claims of the '844 Patent, including Claims 1-14 and 23-31.

72.     Cisco knowingly and actively aided and abetted the direct infringement of the '844 Patent by instructing and encouraging its customers, purchasers, users and developers to use the '844 Accused Products.  Such instructions and encouragement include, but are not limited to, advising third parties to use the '844 Accused Products in an infringing manner, providing a mechanism through which third parties may infringe the '844 Patent, specifically through the use of Cisco's AMP, Cisco's CCSI, Talos, and AMP Threat Grid technologies, and by advertising and promoting the use of the '844 Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the '844 Accused Products in an infringing manner.

73.     Cisco updates and maintains an HTTP site with Cisco's quick start guides, administration guides, user guides, and operating instructions which cover in depth aspects of operating Cisco's offerings.  *See* http://www.cisco.com/c/en/us/support/index.html/, attached hereto as Exhibit 30; *see also* http://www.cisco.com/c/en/us/support/security/fireamp-endpoints/tsd-products-support-configure.html, attached hereto as Exhibit 31; http://www.cisco.com/c/en/us/support/security/amp-appliances/tsd-products-support-configure.html/, attached hereto as Exhibit 32; http://www.cisco.com/c/en/us/support/security/asa-firepower-services/tsd-products-support-series-home.html, attached hereto as Exhibit 33; http://www.cisco.com/c/en/us/support/security/fireamp-private-cloud-virtual-appliance/products-configuration-examples-list.html, attached hereto as Exhibit 34; http://www.cisco.com/c/en/us/support/security/cloud-web-security/products-configuration-examples-list.html, attached hereto as Exhibit 35; http://www.cisco.com/c/en/us/support/security/email-security-appliance/tsd-products-support-series-home.html, attached hereto as Exhibit 36; http://www.cisco.com/c/en/us/support/security/web-security-appliance/tsd-products-support-series-home.html, attached hereto as Exhibit 37; https://meraki.cisco.com/support/, attached hereto as Exhibit

SECOND AMENDED COMPLAINT FOR
PATENT INFRINGEMENT

CASE NO. 5:17-CV-00072-BLF

38; http://www.cisco.com/c/en/us/support/security/amp-threat-grid-appliances/tsd-products-support-series-home.html, attached hereto as Exhibit 39.

## COUNT III
### (Direct Infringement of the '780 Patent pursuant to 35 U.S.C. § 271(a))

74.     Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

75.     Cisco has infringed and continues to infringe Claims 1-18 of the '780 Patent in violation of 35 U.S.C. § 271(a).

76.     Cisco's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

77.     Cisco's acts of making, using, importing, selling, and/or offering for sale infringing products and services have been without the permission, consent, authorization, or license of Finjan.

78.     Cisco's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Cisco's products and services, including Cisco AMP for Endpoints, Cisco AMP for Networks, Cisco AMP for ASA with FirePOWER Services, Cisco AMP Private Cloud Virtual Appliance, Cisco AMP for CWS, ESA, or WSA, Cisco AMP for Meraki MX, Cisco AMP Threat Grid (i.e., the Accused AMP Products), and the Accused Talos Service (collectively, the "'780 Accused Products").

79.     The '780 Accused Products embody the patented invention of the '780 Patent and infringe the '780 Patent because they practice a method of obtaining a downloadable that includes one or more references to software components required to be executed by the downloadable, fetching at least one software component required to be executed by the downloadable, and performing a hashing function on the downloadable and the fetched software components to generate a Downloadable ID.  For example, Cisco AMP for Endpoints perform hash value lookups using SHA256 hashing technology, including dropper files.  As shown below, Cisco AMP for Endpoints uses SHA hash to perform lookups in the Talos Cloud.

SECOND AMENDED COMPLAINT FOR          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT



*See* http://ciscoday.me/pdf/Cisco%20AMP%20Sasa%20Milic%20Asseco.pdf, attached hereto as Exhibit 23.  In creating that hash value, Cisco AMP for Endpoints obtains the software components required to be executed and performs a hashing function on the downloadable and fetched software components.

80.     As a result of Cisco's unlawful activities, Finjan has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Finjan is entitled to preliminary and/or permanent injunctive relief.

81.     Cisco's infringement of the '780 Patent has injured and continues to injure Finjan in an amount to be proven at trial.

82.     Cisco has been well aware of Finjan's patents, including the '780 Patent, and has continued its infringing activity despite this knowledge.  Finjan and Cisco's relationship dates back over two decades.  Throughout the years, until the time that Cisco began infringing Finjan's patents, Cisco and Finjan maintained an amicable relationship and consistently collaborated together on cybersecurity.  In the late 1990's, the parties entered into an original equipment manufacturer agreement that allowed Cisco to incorporate Finjan's technology into Cisco's products.  As early as

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

this time, Cisco saw the value of Finjan's technology.  Cisco explicitly acknowledged in a 1997 Fortune Magazine article that "discussions with Finjan brought it to the 'watershed decision to include content inspection in its security products," and that Cisco has "very high regard for Finjan and its technology."

83.     Cisco knew of the pending application for the '780 Patent at least as early as June 2, 2004, and the issued '780 Patent at least as early as November 14, 2008.  For example, on or about June 2, 2004, Finjan and Cisco entered into a Series D Preferred Stock Purchase Agreement, which specifically identified and described the application that resulted in the '780 Patent.  Also, in or around 2005, Cisco had an observer, Cisco's then-Vice President of Corporate Development, Yoav Samet, attend Finjan's board of director meetings, during which Finjan's patents and technology were discussed. Also, in or around December 2006, Finjan gave a presentation to Cisco titled "Introducing Finjan Vital Security" that discussed Finjan's patents and described in detail the technology covered by the '780 Patent and Finjan's products that practiced that technology.  In addition, on or about November 14, 2008, Finjan and Cisco entered into a Series E Preferred Stock Purchase Agreement which specifically identified and described the '780 Patent.  Also, on or about March 14, 2014, Finjan Holdings, Inc. published its Annual Report for investors, including Cisco, which specifically identified and described the '780 Patent and pending lawsuits Finjan filed against various third parties for infringement of this patent.  Cisco has been one of the Beneficial Owners of Finjan, owning 7.5% of Finjan Holdings, Inc.'s common stock and holding voting power continuously at least since June 2013 when Finjan became a public company.

84.     Despite the foregoing knowledge of the '780 Patent and the technology covered by this patent, and despite a high likelihood that its actions constituted infringement of this patent, Cisco proceeded to and continued to infringe the '780 Patent.  Specifically, Cisco acquired technology that infringes the '780 Patent from Sourcefire in or around October 2013, integrated that company's appliances and technology into its own product lines and has continued with its infringing conduct since that time.

SECOND AMENDED COMPLAINT FOR                              CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

85.     Cisco's infringement of the '780 Patent is egregious.  Cisco and Finjan had been in a long and extensive collaborative working relationship for almost twenty years during which Cisco had "very high regard for Finjan and its technology." Based on information obtained from Finjan concerning Finjan's patents and technology, Cisco continuously invested in Finjan since at least as early as 2004.  Finjan and Cisco maintained an amicable and collaborative relationship over the course of these years, in which Cisco's representative even attended multiple Finjan board meetings where Finjan's information, including its patents, technology and business strategy, was discussed. From at least as early as 2008, Cisco gained knowledge of the '780 Patent and the technology it covers.  Cisco recognized and valued Finjan's patents, including the '780 Patent, and it desired to have this patented technology incorporated into its own products and services.  Thus, in violation of the approximately twenty year relationship of trust and collaboration in which Cisco led Finjan to believe it was a partner, Cisco made the deliberate decision to acquire and to continue to sell products and services that it knew infringed the '780 Patent.

86.     On information and belief, Cisco has undertaken no efforts to design these products or services around the '780 Patent to avoid infringement despite Cisco's knowledge and understanding that its products and services infringe the '780 Patent.  Thus, Cisco's infringement of the '780 Patent is willful and egregious, warranting enhancement of damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

**COUNT IV**
**(Indirect Infringement of the '780 Patent pursuant to 35 U.S.C. § 271(b))**

87.     Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

88.     Cisco has induced and continues to induce infringement of at least Claims 1-8 of the '780 Patent under 35 U.S.C. § 271(b).

89.     In addition to directly infringing the '780 Patent, Cisco indirectly infringes the '780 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including customers, purchasers, users and developers, to perform some of the steps of the method claims,

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

1   either literally or under the doctrine of equivalents, of the '780 Patent, where all the steps of the

2   method claims are performed by either Cisco or its customers, purchasers, users and developers, or

3   some combination thereof.  Cisco knew or was willfully blind to the fact that it was inducing others,

4   including customers, purchasers, users and developers, to infringe by practicing, either themselves or

5   in conjunction with Cisco, one or more method claims of the '780 Patent, including Claims 1-8.

6       90.     Cisco knowingly and actively aided and abetted the direct infringement of the '780

7   Patent by instructing and encouraging its customers, purchasers, users and developers to use the '780

8   Accused Products.  Such instructions and encouragement include, but are not limited to, advising

9   third parties to use the '780 Accused Products in an infringing manner, providing a mechanism

10  through which third parties may infringe the '780 Patent, specifically through the use of Cisco's

11  AMP, Cisco's CCSI, Talos, and AMP Threat Grid technologies, and by advertising and promoting

12  the use of the '780 Accused Products in an infringing manner, and distributing guidelines and

13  instructions to third parties on how to use the '780 Accused Products in an infringing manner.

14      91.     Cisco updates and maintains an HTTP site with Cisco's quick start guides,

15  administration guides, user guides, and operating instructions which cover in depth aspects of

16  operating Cisco's offerings.  *See* http://www.cisco.com/c/en/us/support/index.html/, attached hereto as

17  Exhibit 30; *see also* http://www.cisco.com/c/en/us/support/security/fireamp-endpoints/tsd-products-

18  support-configure.html, attached hereto as Exhibit 31;

19  http://www.cisco.com/c/en/us/support/security/amp-appliances/tsd-products-support-configure.html/,

20  attached hereto as Exhibit 32; http://www.cisco.com/c/en/us/support/security/asa-firepower-

21  services/tsd-products-support-series-home.html, attached hereto as Exhibit 33;

22  http://www.cisco.com/c/en/us/support/security/fireamp-private-cloud-virtual-appliance/products-

23  configuration-examples-list.html, attached hereto as Exhibit 34;

24  http://www.cisco.com/c/en/us/support/security/cloud-web-security/products-configuration-examples-

25  list.html, attached hereto as Exhibit 35; http://www.cisco.com/c/en/us/support/security/email-security-

26  appliance/tsd-products-support-series-home.html, attached hereto as Exhibit 36;

27  http://www.cisco.com/c/en/us/support/security/web-security-appliance/tsd-products-support-series-

28

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

home.html, attached hereto as Exhibit 37; https://meraki.cisco.com/support/, attached hereto as Exhibit 38; http://www.cisco.com/c/en/us/support/security/amp-threat-grid-appliances/tsd-products-support-series-home.html, attached hereto as Exhibit 39.

## COUNT V
### (Direct Infringement of the '633 Patent pursuant to 35 U.S.C. § 271(a))

92.     Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

93.     Cisco has infringed and continues to infringe Claims 1-41 of the '633 Patent in violation of 35 U.S.C. § 271(a).

94.     Cisco's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

95.     Cisco's acts of making, using, importing, selling, and/or offering for sale infringing products and services have been without the permission, consent, authorization, or license of Finjan.

96.     Cisco's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Cisco's products and services, including Cisco AMP for Endpoints, Cisco AMP for Networks, Cisco AMP for ASA with FirePOWER Services, Cisco AMP Private Cloud Virtual Appliance, Cisco AMP for CWS, ESA, or WSA, Cisco AMP for Meraki MX, Cisco AMP Threat Grid (i.e., the Accused AMP Products), and the Accused Talos Service (collectively, the "'633 Accused Products").

97.     The '633 Accused Products embody the patented invention of the '633 Patent and infringe the '633 Patent because they practice a method and a system of receiving downloadable information, determining whether that the downloadable information includes executable code, and transmitting mobile protection code to at least one information destination of the downloadable information if the downloadable information is determined to include executable code.  For example, as shown below, the '633 Accused Products provide protection by sending a file for sandboxing with mobile protection code.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT



*See* http://www.cisco.com/assets/global/MK/events/2015/cisco_day/presentations/Gyorgy_Acs-Content_Security_Update.pdf, attached hereto as Exhibit 40.

98.     Incoming downloadable information are scanned to determine whether they have executable information.  If they include executable information, mobile protection code and the executable code are sent to an information destination, such as a sandbox.

99.     As a result of Cisco's unlawful activities, Finjan has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Finjan is entitled to preliminary and/or permanent injunctive relief.

100.    Cisco's infringement of the '633 Patent has injured and continues to injure Finjan in an amount to be proven at trial.

101.    Cisco has been well aware of Finjan's patents, including the '633 Patent, and has continued its infringing activity despite this knowledge.  Finjan and Cisco's relationship dates back over two decades.  Throughout the years, until the time that Cisco began infringing Finjan's patents, Cisco and Finjan maintained an amicable relationship and consistently collaborated together on

SECOND AMENDED COMPLAINT FOR                     CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

cybersecurity.  In the late 1990's, the parties entered into an original equipment manufacturer agreement that allowed Cisco to incorporate Finjan's technology into Cisco's products.  As early as this time, Cisco saw the value of Finjan's technology.  Cisco explicitly acknowledged in a 1997 Fortune Magazine article that "discussions with Finjan brought it to the 'watershed decision to include content inspection in its security products," and that Cisco has "very high regard for Finjan and its technology."

102.   Cisco knew of the application that resulted in the '633 Patent at least as early as November 14, 2008, and of the issued '633 Patent at least as early as March 14, 2014.  For example, on or about November 14, 2008, Finjan and Cisco entered into a Series E Preferred Stock Purchase Agreement which specifically identified the application that resulted in the '633 Patent.  Also, on or about March 14, 2014, Finjan Holdings, Inc. published its Annual Report for investors, including Cisco, which specifically identified and described the '633 Patent and pending lawsuits Finjan filed against various third parties for infringement of this patent.  Cisco has been one of the Beneficial Owners of Finjan, owning 7.5% of Finjan Holdings, Inc.'s common stock and holding voting power continuously at least since June 2013 when Finjan became a public company.

103.   Despite the foregoing knowledge of the '633 Patent and the technology covered by this patent, and despite a high likelihood that its actions constituted infringement of this patent, Cisco proceeded to and continued to infringe the '633 Patent.  Specifically, Cisco acquired technology that infringes the '633 Patent from Sourcefire in or around October 2013, integrated that company's appliances and technology into its own product lines and has continued with its infringing conduct since that time.

104.   Cisco's infringement of the '633 Patent is egregious.  Cisco and Finjan had been in a long and extensive collaborative working relationship for almost twenty years during which Cisco had "very high regard for Finjan and its technology."  Based on information obtained from Finjan concerning Finjan's patents and technology, Cisco continuously invested in Finjan since at least as early as 2004.  Finjan and Cisco maintained an amicable and collaborative relationship over the course of these years, in which Cisco's representative even attended multiple Finjan board meetings where

SECOND AMENDED COMPLAINT FOR                              CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

Finjan's information, including its patents, technology and business strategy, was discussed.  From at least as early as 2014, Cisco gained knowledge of the '633 Patent and the technology it covers.  Cisco recognized and valued Finjan's patents, including the '633 Patent, and it desired to have this patented technology incorporated into its own products and services.  Thus, in violation of the approximately twenty year relationship of trust and collaboration in which Cisco led Finjan to believe it was a partner, Cisco made the deliberate decision to acquire and to continue to sell products and services that it knew infringed the '633 Patent.

105.    On information and belief, Cisco has undertaken no efforts to design these products or services around the '633 Patent to avoid infringement despite Cisco's knowledge and understanding that its products and services infringe these patents.  Thus, Cisco's infringement of the '633 Patent is willful and egregious, warranting enhancement of damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## <u>COUNT VI</u>
### (Indirect Infringement of the '633 Patent pursuant to 35 U.S.C. § 271(b))

106.    Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

107.    Cisco has induced and continues to induce infringement of at least Claims 1-7, 14-20, 28-33, and 42-43 of the '633 Patent under 35 U.S.C. § 271(b).

108.    In addition to directly infringing the '633 Patent, Cisco indirectly infringes the '633 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including customers, purchasers, users and developers, to perform one or more of the steps of the method claims, either literally or under the doctrine of equivalents, of the '633 Patent, where all the steps of the method claims are performed by either Cisco, its customers, purchasers, users, and developers, or some combination thereof.  Cisco knew or was willfully blind to the fact that it was inducing others, including customers, purchasers, users, and developers, to infringe by practicing, either themselves or in conjunction with Cisco, one or more method claims of the '633 Patent, including Claims 1-7, 14-20, 28-33, and 42-43.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

109.    Cisco knowingly and actively aided and abetted the direct infringement of the '633 Patent by instructing and encouraging its customers, purchasers, users, and developers to use the '633 Accused Products.  Such instructions and encouragement include, but are not limited to, advising third parties to use the '633 Accused Products in an infringing manner, providing a mechanism through which third parties may infringe the '633 Patent, specifically through the use of Cisco's AMP, Cisco's CCSI, Talos, and AMP Threat Grid technologies, and by advertising and promoting the use of the '633 Accused Products in an infringing manner, and distributing guidelines and instructions to third parties on how to use the '633 Accused Products in an infringing manner.

110.    Cisco updates and maintains an HTTP site with Cisco's quick start guides, administration guides, user guides, and operating instructions which cover in depth aspects of operating Cisco's offerings.  *See* http://www.cisco.com/c/en/us/support/index.html/, attached hereto as Exhibit 30; *see also* http://www.cisco.com/c/en/us/support/security/fireamp-endpoints/tsd-products-support-configure.html, attached hereto as Exhibit 31; http://www.cisco.com/c/en/us/support/security/amp-appliances/tsd-products-support-configure.html/, attached hereto as Exhibit 32; http://www.cisco.com/c/en/us/support/security/asa-firepower-services/tsd-products-support-series-home.html, attached hereto as Exhibit 33; http://www.cisco.com/c/en/us/support/security/fireamp-private-cloud-virtual-appliance/products-configuration-examples-list.html, attached hereto as Exhibit 34; http://www.cisco.com/c/en/us/support/security/cloud-web-security/products-configuration-examples-list.html, attached hereto as Exhibit 35; http://www.cisco.com/c/en/us/support/security/email-security-appliance/tsd-products-support-series-home.html, attached hereto as Exhibit 36; http://www.cisco.com/c/en/us/support/security/web-security-appliance/tsd-products-support-series-home.html, attached hereto as Exhibit 37; https://meraki.cisco.com/support/, attached hereto as Exhibit 38; http://www.cisco.com/c/en/us/support/security/amp-threat-grid-appliances/tsd-products-support-series-home.html, attached hereto as Exhibit 39.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

1

2

## COUNT VII
## (Direct Infringement of the '154 Patent pursuant to 35 U.S.C. § 271(a))

3

4

111.    Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

5

6

112.    Cisco has infringed and continues to infringe Claims 1-12 of the '154 Patent in violation of 35 U.S.C. § 271(a).

7

8

113.    Cisco's infringement is based upon literal infringement or infringement under the doctrine of equivalents, or both.

9

10

114.    Cisco's acts of making, using, importing, selling, and/or offering for sale infringing products and services have been without the permission, consent, authorization, or license of Finjan.

11

12

115.    Cisco's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Cisco's products and services, including Email Security Appliances with Outbreak Filters using the Talos Service, which embody the patented invention of the '154 Patent. Such products include ESA C690, ESA C690X, ESA C680, ESA C390, ESA C380, ESA C190, ESA C170, ESAV C100v, ESAV C300v, ESAV C600v, SMA M690/690X/680, SMA M390/380 and SMA M190/170 (collectively, the "'154 Accused Products").

13

14

15

16

116.    The '154 Accused Products embody the patented invention of the '154 Patent and infringe the '154 Patent because they utilize and/or incorporate a system for protecting a computer from dynamically generated malicious content, comprising a content processor (i) for processing content received over a network, the content including a call to a first function, and the call including an input, and (ii) for invoking a second function with the input, only if a security computer indicates that such invocation is safe; a transmitter for transmitting the input to the security computer for inspection, when the first function is invoked; and a receiver for receiving an indicator from the security computer whether it is safe to invoke the second function with the input. For example, as shown below, the '154 Accused Products utilize Outbreak Filters that rewrites incoming emails and provide real-time scanning of links and attachments.

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT



**Figure 1.**   A simple flow of Cisco Outbreak Filters

1. An incoming email is scanned by Outbreak Filters. The refined rule set identifies this as a potential phishing or targeted attack email and handles it as configured on the appliance. By default, a disclaimer is prepended to the email text identifying it as a phish and the URL contained in the email is rewritten.

2. The email with the rewritten url is delivered to the user's inbox.

3. If opened, this rewritten email link sends the user to a public proxy where the webpage content is intercepted and scanned in the cloud in real time using Outbreak Intelligence.

4. If malware is detected on the page, a blocked page message is served up to the user and information about the URL is passed from the cloud back to Cisco Talos. Otherwise, the user is given a choice: surf the page through the proxy or go directly to the site.

*See* http://www.cisco.com/c/en/us/products/collateral/security/email-security-appliance/white_paper_c11-684611.html at 2, attached hereto as Exhibit 28.  Incoming emails are received at the Email Security Appliance, where they are scanned for dynamic content and URL links in the email are rewritten.  The rewritten email links redirect to a public proxy were the content is intercepted and scanned in the cloud using Talos and other systems in real time.  If the content is safe, the content is sent to the end-user.  If the content is malicious, the user is sent blocked page message.

117.    As a result of Cisco's unlawful activities, Finjan has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Finjan is entitled to preliminary and/or permanent injunctive relief.

118.    Cisco's infringement of the '154 Patent has injured and continues to injure Finjan in an amount to be proven at trial.

119.    Cisco has been well aware of Finjan's patents, including the '154 Patent, and has continued its infringing activity despite this knowledge.  Finjan and Cisco's relationship dates back over two decades.  Throughout the years, until the time that Cisco began infringing Finjan's patents,

SECOND AMENDED COMPLAINT FOR
PATENT INFRINGEMENT

CASE NO. 5:17-CV-00072-BLF

1  Cisco and Finjan maintained an amicable relationship and consistently collaborated together on

2  cybersecurity.  In the late 1990's, the parties entered into an original equipment manufacturer

3  agreement that allowed Cisco to incorporate Finjan's technology into Cisco's products.  As early as

4  this time, Cisco saw the value of Finjan's technology.  Cisco explicitly acknowledged in a 1997

5  Fortune Magazine article that "discussions with Finjan brought it to the 'watershed decision to include

6  content inspection in its security products," and that Cisco has "very high regard for Finjan and its

7  technology."

8          120.    Cisco knew of the '154 Patent at least as early as March 14, 2014.  For example, on or

9  about March 14, 2014, Finjan Holdings, Inc. published its Annual Report for investors, including

10 Cisco, which specifically identified and described the '154 Patent and pending lawsuits Finjan filed

11 against various third parties for infringement of this patent.  Cisco has been one of the Beneficial

12 Owners of Finjan, owning 7.5% of Finjan Holdings, Inc.'s common stock and holding voting power

13 continuously at least since June 2013 when Finjan became a public company.

14         121.    Despite the foregoing knowledge of the '154 Patent and the technology covered by this

15 patent, and despite a high likelihood that its actions constituted infringement of this patent, Cisco

16 proceeded to and continued to infringe the '154 Patent.  Specifically, Cisco acquired technology that

17 infringes the '844 Patent from Sourcefire in or around October 2013, integrated that company's

18 appliances and technology into its own product lines and has continued with its infringing conduct

19 since that time.  Cisco also integrated into its products Outbreak Filters since at least as early as March

20 2012 and has continued with its infringing conduct since that time.

21         122.    Cisco's infringement of the '154 Patent is egregious.  Cisco and Finjan had been in a

22 long and extensive collaborative working relationship for almost twenty years during which Cisco had

23 "very high regard for Finjan and its technology."  Based on information obtained from Finjan

24 concerning Finjan's patents and technology, Cisco continuously invested in Finjan since at least as

25 early as 2004.  Finjan and Cisco maintained an amicable and collaborative relationship over the course

26 of these years, in which Cisco's representative even attended multiple Finjan board meetings where

27 Finjan's information, including its patents, technology and business strategy, was discussed.  From at

28

SECOND AMENDED COMPLAINT FOR                              CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

least as early as 2014, Cisco gained knowledge of the '154 Patent and the technology it covers. Cisco recognized and valued Finjan's patents, including the '154 Patent, and it desired to have this patented technology incorporated into its own products and services. Thus, in violation of the approximately twenty year relationship of trust and collaboration in which Cisco led Finjan to believe it was a partner, Cisco made the deliberate decision to acquire and to continue to sell products and services that it knew infringed the '154 Patent.

123.    On information and belief, Cisco has undertaken no efforts to design these products or services around the '154 Patent to avoid infringement despite Cisco's knowledge and understanding that its products and services infringe these patents. Thus, Cisco's infringement of the '154 Patent is willful and egregious, warranting enhancement of damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT VIII
### (Direct Infringement of the '494 Patent pursuant to 35 U.S.C. § 271(a))

124.    Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

125.    Cisco has infringed and continues to infringe Claims 1-18 of the '494 Patent in violation of 35 U.S.C. § 271(a).

126.    Cisco's infringement is based upon literal infringement or, in the alternative, infringement under the doctrine of equivalents.

127.    Cisco acts of making, using, importing, selling, and/or offering for sale infringing products and services have been without the permission, consent, authorization or license of Finjan.

128.    Cisco's infringement includes, but is not limited to, the manufacture, use, sale, importation and/or offer for sale of Cisco's products and services, including, Cisco AMP for Endpoints, Cisco AMP for Networks, Cisco AMP for ASA with FirePOWER Services, Cisco AMP Private Cloud Virtual Appliance, Cisco AMP for CWS, ESA, or WSA, Cisco AMP for Meraki MX, Cisco AMP Threat Grid (i.e., the Accused AMP Products), and the Accused Talos Service (collectively, the "'494 Accused Products").

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

129.   The '494 Accused Products embody the patented invention of the '494 Patent and infringe the '494 Patent because they practice a computer-based method comprising receiving an incoming downloadable, deriving security profile data for the downloadable, including a list of suspicious computer operations that may be attempted by the downloadable and storing the downloadable security profile data in a database.   For example, Cisco AMP for Endpoint receives an incoming downloadable, and performs a lookup in the cloud where a downloadable security profile is derived and stored in a database, as shown below.



*See* http://ftp.cisco.cz/Seminare/2013-ConnectClub/2014-05-28-AMP-GyorgyAcs.pdf, attached hereto as Exhibit 29.

130.   As shown below, a list of suspicious computer operations is collected.

SECOND AMENDED COMPLAINT FOR
PATENT INFRINGEMENT

CASE NO. 5:17-CV-00072-BLF

| |
|---|
| Binary contains device paths (device paths are often used for kernelmode <-> usermode communication) |
| Binary contains paths to debug symbols |
| Creates files inside the user directory |
| Creates temporary files |
| Printf formatting strings found in memory and binary data |
| Queries a list of all running drivers |
| Queries a list of all running processes |
| Reads ini files |
| Spawns processes |
| Urls found in memory or binary data |
| Binary may include packed or crypted data |
| Creates an autostart registry key |
| Creates driver files |
| Creates files inside the system directory |
| Drops PE files |
| Entrypoint lies outside standard sections |
| Found strings which match to known social media urls |
| May tried to detect the virtual machine to detect the environment (VM Detection) |
| PE file contains sections with non-standard names |
| PE sections with suspicious entropy found |
| Performs DNS lookups |
| Spawns drivers |
| AV process strings found (often used to terminate AV products) |
| Contains capabilities to detect virtual machines |
| Deletes Windows files |
| Deletes keys which are related to windows safe boot (disables safe mode boot) |
| Hooks files or directories query functions (used to hide files and directories) |
| Hooks processes query functions(used to hide processes) |
| Hooks registry keys query functions (used to hide registry keys) |
| Modifies the system service dispatch table (places SSDT hooks) |

*See* http://ftp.cisco.cz/Seminare/2013-ConnectClub/2014-05-28-AMP-GyorgyAcs.pdf, attached hereto as Exhibit 29.

131.    As a result of Cisco's unlawful activities, Finjan has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.  Accordingly, Finjan is entitled to preliminary and/or permanent injunctive relief.

132.    Cisco's infringement of the '494 Patent has injured and continues to injure Finjan in an amount to be proven at trial.

133.    Cisco has been well aware of Finjan's patents, including the '494 Patent, and has continued its infringing activity despite this knowledge.  Finjan and Cisco's relationship dates back over two decades.  Throughout the years, until the time that Cisco began infringing Finjan's patents, Cisco and Finjan maintained an amicable relationship and consistently collaborated together on cybersecurity.  In the late 1990's, the parties entered into an original equipment manufacturer agreement that allowed Cisco to incorporate Finjan's technology into Cisco's products.  As early as this time, Cisco saw the value of Finjan's technology.  Cisco explicitly acknowledged in a 1997 Fortune Magazine article that "discussions with Finjan brought it to the 'watershed decision to include

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

content inspection in its security products," and that Cisco has "very high regard for Finjan and its technology."

134.    Cisco knew of the '494 Patent at least by May 8, 2014.  For example, on or about May 8, 2014, Finjan Holdings, Inc. published its Quarterly Report for investors, which included Cisco. Cisco has been one of the Beneficial Owners of Finjan, owning 7.5% of Finjan Holdings, Inc.'s common stock and holding voting power continuously at least since June 2013 when Finjan became a public company.   This Quarterly Report specifically identified and described the pending lawsuits Finjan had filed against third parties for infringement of the '494 Patent and described the '494 Patent as follows:

> On March 18, 2014, our subsidiary, Finjan, was issued a new U.S. patent (8,677,494) expiring in 2017 (the "494 Patent").  This patent relates to a proprietary malicious mobile code runtime monitoring systems and methods, designed to address potential network security threats through better recognition of malicious code segments passing through Internet infrastructure and networks to endpoint devices.  The techniques described in the '494 Patent cover protection systems and methods offering security for one or more personal computers and/or other intermittently or persistently network accessible devices or processes.  Specifically, the inventive aspects of the patent cover various defenses from undesirable or otherwise malicious operations of Java TN applets, ActiveX™ controls, JavaScript™ scripts, Visual Basic scripts, add-ins, and downloaded/uploaded programs which are often downloaded by users without considering the inherent security risks.

135.    Despite the foregoing knowledge of the '494 Patent and the technology covered by this patent, and despite a high likelihood that its actions constituted infringement of this patent, Cisco proceeded to and continued to infringe the '494 Patent.  Specifically, Cisco acquired technology that infringes the '494 Patent from Sourcefire in or around October 2013, integrated that company's appliances and technology into its own product lines and has continued with its infringing conduct since the issuance of the '494 Patent.

136.    Cisco's infringement of the '494 Patent is egregious.  Cisco and Finjan had been in a long and extensive collaborative working relationship for almost twenty years during which Cisco had "very high regard for Finjan and its technology."  Based on information obtained from Finjan

40

concerning Finjan's patents and technology, Cisco continuously invested in Finjan since at least as early as 2004.  Finjan and Cisco maintained an amicable and collaborative relationship over the course of these years, in which Cisco's representative even attended multiple Finjan board meetings where Finjan's information, including its patents, technology and business strategy, was discussed.  From at least as early as 2014, Cisco gained knowledge of the '494 Patent and the technology it covers.  Cisco recognized and valued Finjan's patents, including the '494 Patent, and it desired to have this patented technology incorporated into its own products and services.  Thus, in violation of the approximately twenty year relationship of trust and collaboration in which Cisco led Finjan to believe it was a partner, Cisco made the deliberate decision to continue to sell products and services that it knew infringed the '494 Patent.

137.    On information and belief, Cisco has undertaken no efforts to design these products or services around the '494 Patent to avoid infringement despite Cisco's knowledge and understanding that its products and services infringe this patent.  Thus, Cisco's infringement of the '494 Patent is willful and egregious, warranting enhancement of damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

### COUNT IX
### (Induced Infringement of the '494 Patent pursuant to 35 U.S.C. § 271(b))

138.    Finjan repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

139.    Cisco has induced and continues to induce infringement of at least Claims 1-9 of the '494 Patent under 35 U.S.C. § 271(b).

140.    In addition to directly infringing the '494 Patent, Cisco indirectly infringes the '494 Patent pursuant to 35 U.S.C. § 271(b) by instructing, directing and/or requiring others, including customers, purchasers, users and developers, to perform one or more of the steps of the method claims, either literally or under the doctrine of equivalents, of the '494 Patent, where all the steps of the method claims are performed by either Cisco, its customers, purchasers, users, and developers, or some combination thereof.  Cisco knew or was willfully blind to the fact that it was inducing others,

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

1  including customers, purchasers, users, and developers, to infringe by practicing, either themselves or

2  in conjunction with Cisco, one or more method claims of the '494 Patent, including Claims 1-9.

3  141. Cisco knowingly and actively aided and abetted the direct infringement of the '494

4  Patent by instructing and encouraging its customers, purchasers, users, and developers to use the '494

5  Accused Products. Such instructions and encouragement include, but are not limited to, advising

6  third parties to use the '494 Accused Products in an infringing manner, providing a mechanism

7  through which third parties may infringe the '494 Patent, specifically through the use of Cisco's

8  AMP, Cisco's CCSI, Talos, and AMP Threat Grid technologies, and by advertising and promoting

9  the use of the '494 Accused Products in an infringing manner, and distributing guidelines and

10  instructions to third parties on how to use the '494 Accused Products in an infringing manner.

11  142. Cisco updates and maintains an HTTP site with Cisco's quick start guides,

12  administration guides, user guides, and operating instructions which cover in depth aspects of

13  operating Cisco's offerings. *See* http://www.cisco.com/c/en/us/support/index.html/, attached hereto as

14  Exhibit 30; *see also* http://www.cisco.com/c/en/us/support/security/fireamp-endpoints/tsd-products-

15  support-configure.html, attached hereto as Exhibit 31;

16  http://www.cisco.com/c/en/us/support/security/amp-appliances/tsd-products-support-configure.html/,

17  attached hereto as Exhibit 32; http://www.cisco.com/c/en/us/support/security/asa-firepower-

18  services/tsd-products-support-series-home.html, attached hereto as Exhibit 33;

19  http://www.cisco.com/c/en/us/support/security/fireamp-private-cloud-virtual-appliance/products-

20  configuration-examples-list.html, attached hereto as Exhibit 34;

21  http://www.cisco.com/c/en/us/support/security/cloud-web-security/products-configuration-examples-

22  list.html, attached hereto as Exhibit 35; http://www.cisco.com/c/en/us/support/security/email-security-

23  appliance/tsd-products-support-series-home.html, attached hereto as Exhibit 36;

24  http://www.cisco.com/c/en/us/support/security/web-security-appliance/tsd-products-support-series-

25  home.html, attached hereto as Exhibit 37; https://meraki.cisco.com/support/, attached hereto as Exhibit

26  38; http://www.cisco.com/c/en/us/support/security/amp-threat-grid-appliances/tsd-products-support-

27  series-home.html, attached hereto as Exhibit 39.

28

SECOND AMENDED COMPLAINT FOR          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

**PRAYER FOR RELIEF**

WHEREFORE, Finjan prays for judgment and relief as follows:

A.      An entry of judgment holding that Cisco has infringed and is infringing the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent; has induced infringement and is inducing infringement of the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent;

B.      A preliminary and permanent injunction against Cisco and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from infringing the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent, or inducing the infringement of the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C.      An award to Finjan of such damages as it shall prove at trial against Cisco that is adequate to fully compensate Finjan for Cisco's infringement of the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent, said damages to be no less than a reasonable royalty;

D.      A determination that Cisco's infringement has been willful, wanton, deliberate and egregious and that the damages against it be increased up to treble on this basis or for any other basis within the Court's discretion;

E.      A finding that this case is "exceptional" and an award to Finjan of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

F.      An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of the '844 Patent, the '780 Patent, the '633 Patent, the '154 Patent, and the '494 Patent; and

G.      Such further and other relief as the Court may deem proper and just.

SECOND AMENDED COMPLAINT FOR                    CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT

1

Respectfully submitted,

2    Dated:  July 7, 2017                    By:    /s/ Paul J. Andre

3                                                Paul J. Andre (State Bar No. 196585)
                                                 Lisa Kobialka (State Bar No. 191404)
4                                                James Hannah (State Bar No. 237978)
                                                 KRAMER LEVIN NAFTALIS
5                                                  & FRANKEL LLP
                                                 990 Marsh Road
6                                                Menlo Park, CA  94025
                                                 Telephone:  (650) 752-1700
7                                                Facsimile:  (650) 752-1800
                                                 pandre@kramerlevin.com
8                                                lkobialka@kramerlevin.com
                                                 jhannah@kramerlevin.com
9

10                                               *Attorneys for Plaintiff*
                                                 FINJAN, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44

1

## **DEMAND FOR JURY TRIAL**

2

    Finjan demands a jury trial on all issues so triable.

3

                        Respectfully submitted,

4

Dated: July 7, 2017          By:   */s/ Paul J. Andre*

5
                             Paul J. Andre (State Bar No. 196585)

6
                             Lisa Kobialka (State Bar No. 191404)
                             James Hannah (State Bar No. 237978)

7
                             KRAMER LEVIN NAFTALIS

8
                               & FRANKEL LLP
                             990 Marsh Road

9
                             Menlo Park, CA  94025
                             Telephone:  (650) 752-1700

10
                             Facsimile:  (650) 752-1800
                             pandre@kramerlevin.com

11
                             lkobialka@kramerlevin.com
                             jhannah@kramerlevin.com

12
                             *Attorneys for Plaintiff*

13
                             FINJAN, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT FOR          CASE NO. 5:17-CV-00072-BLF
PATENT INFRINGEMENT