**DUANE MORRIS LLP**
D. Stuart Bartow (CA SBN 233107)
dsbartow@duanemorris.com
Nicole E. Grigg (SBN 307733)
negrigg@duanemorris.com
2475 Hanover Street
Palo Alto, CA  94304-1194
Telephone: 650.847.4146
Facsimile: 650.847.4151

**DUANE MORRIS LLP**
Joseph A. Powers (PA SBN 84590)
Admitted *Pro Hac Vice*
japowers@duanemorris.com
Jarrad M. Gunther (PA SBN 207038)
Admitted *Pro Hac Vice*
jmgunther@duanemorris.com
30 South 17th Street
Philadelphia, PA  19103
Telephone: 215.979.1000
Facsimile: 215.979.1020

**DUANE MORRIS LLP**
L. Norwood Jameson (GA SBN 003970)
Admitted *Pro Hac Vice*
wjameson@duanemorris.com
Matthew C. Gaudet (GA SBN 287789)
Admitted *Pro Hac Vice*
mcgaudet@duanemorris.com
David C. Dotson (GA SBN 138040)
Admitted *Pro Hac Vice*
dcdotson@duanemorris.com
John R. Gibson (GA SBN 454507)
Admitted *Pro Hac Vice*
jrgibson@duanemorris.com
Jennifer H. Forte (GA SBN 940650)
Admitted *Pro Hac Vice*
jhforte@duanemorris.com
1075 Peachtree NE, Suite 2000
Atlanta, GA 30309
Telephone: 404.253.6900
Facsimile: 404.253.6901

Attorneys for Defendant
CISCO SYSTEMS, INC.

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

FINJAN, INC., a Delaware Corporation,

　　　　　Plaintiff,

　　v.

CISCO SYSTEMS, INC., a California
Corporation,

　　　　　Defendant.

Case No.: 5:17-cv-00072-BLF-SVK

**CISCO SYSTEMS, INC.'S NOTICE OF
MOTION AND MOTION TO STRIKE
PORTIONS OF FINJAN'S AMENDED
EXPERT REPORT ON INFRINGEMENT
OF PATENT NO. 7,647,633**

Date:　　　　April 21, 2020
Time:　　　　10:00 a.m.
Courtroom:　6, 4th Floor
Judge:　　　Hon. Susan Van Keulen

**REDACTED**

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on April 21, 2020 at 10:00 a.m., in Courtroom 6, 4th Floor, United States District Court for the Northern District of California, San Jose Courthouse, 280 South 1st Street, San Jose, CA 95113, Defendant Cisco Systems, Inc. ("Cisco") moves for an Order striking portions of Finjan, Inc.'s ("Finjan") Amended Expert Report on Infringement of Patent No. 7,647,633 for including new theories of infringement that are not contained in Finjan's Operative Infringement Contentions.  This motion is supported by the following Memorandum of Points and Authorities and the Declaration of Nicole E. Grigg, filed concurrently herewith, and such other written or oral argument as may be presented at or before the time this motion is heard by the Court.

## STATEMENT OF RELIEF REQUESTED

Cisco seeks an order striking from the "Amended Expert Report of Nenad Medvidovic, Ph. D Regarding Infringement… of Patent No. 7,647,633" (i) all theories where the "Mobile Protection Code" is a component at the sandbox and not transmitted to the sandbox from an AMP Gateway Product and (ii) all theories based on the ███████████████████████ as Mobile Protection Code.

## STATEMENT OF ISSUES TO BE DECIDED

1) Whether assertions in "Amended Expert Report of Nenad Medvidovic, Ph. D Regarding Infringement… of Patent No. 7,647,633" asserting components at the Cisco  sandboxes that are not transmitted to the sandboxes as "Mobile Protection Code" exceed the scope of the Operative Contentions;

2) Whether assertions in "Amended Expert Report of Nenad Medvidovic, Ph. D Regarding Infringement… of Patent No. 7,647,633" asserting ██████████████████████ as "Mobile Protection Code" exceed the scope of the Operative Contentions.

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     INTRODUCTION**

3        At Judge Freeman's direction, Cisco asks this Court for relief on a procedural dispute

4   regarding Finjan's expert report on infringement of the '633 Patent (the "Amended Expert Report of

5   Nenad Medvidovic, Ph.D. Regarding Infringement . . . of Patent No. 7,647,633" ("Amended '633

6   Report")), which includes improper infringement theories that were not disclosed in Finjan's

7   operative infringement contentions dated November 30, 2017 ("Operative Contentions").  Finjan

8   served the Amended '633 Report after Judge Freeman granted Cisco's motion to strike Finjan's

9   original reports in an Order dated November 12, 2019, because they exceeded the scope of the

10  Operative Contentions.  Finjan then served the Amended '633 Report (along with other amended

11  reports, collectively "Amended Reports") while summary judgment motions were pending.  Cisco

12  files this motion because the Amended '633 Report still exceeds the Operative Contentions.

13       At the January 9 summary judgement hearing, disputes arose about the scope of the

14  Amended Reports.  Judge Freeman directed the parties to confer and referred to this Court any

15  dispute regarding whether the Operative Contentions disclosed the theories advanced by Finjan in its

16  Amended Experts Reports.  Judge Freeman made clear that she would consider Cisco's summary

17  judgment motion on the merits, while the parties concurrently addressed the expert reports with this

18  Court, and that this Court's ruling on the reports would be enforced at trial via a motion in limine.

19       On March 20, the Court granted in part Cisco's summary judgment motion on the "mobile

20  protection code" ("MPC") element of claim 14 of the '633 Patent (the only asserted claim).   (Dkt.

21  388).  Finjan advanced 7 different components as the alleged "MPC" in response to Cisco's motion,

22  and Judge Freeman granted Cisco's motion as to 4 of those 7 components, leaving 3 for trial.

23       The issue before this Court relates to the 3 remaining components that Finjan accuses as

24  MPC, and whether Finjan made such allegations in the Operative Contentions.  Judge Freeman

25  construed MPC as "code that, at runtime, monitors or intercepts actually or potentially malicious

26  code operations without modifying the executable code, where the mobile protection code itself must

27  be executable."  4/30/19 Order (Dkt. 247).  The only alleged MPC in the Operative Contentions

28  were items that are ***transmitted to a sandbox*** from a device such as a gateway (which receives an

1   incoming file).  Then, Finjan's original and Amended '633 Reports added a new theory, which

2   accused pre-existing components of the sandbox that are not transmitted at all.  By summary

3   judgment, Finjan abandoned its original theory in toto, and only accused 7 pre-existing (and un-

4   transmitted) components of the sandbox as MPC.  Thus, all 7 of the components that the Court

5   considered at summary judgment were part of this new theory, i.e., items that are not transmitted to

6   the sandbox, but that were already components of the sandbox.  Neither this theory nor the 7 specific

7   components (3 of which survived summary judgment) were disclosed in the Operative Contentions.

8   **II.     BACKGROUND**

9        **A.     Prior Orders**

10       The dispute on the Amended '633 Report has a long history, with Finjan already having lost

11  two rounds of motion practice.  Finjan sought to make numerous amendments to each of its patent

12  contentions at the close of fact discovery, including the '633 Patent.  Finjan argued that its proposed

13  amendments merely added component names.  Dkt. 322-47 at 6.  This Court rejected these attempted

14  amendments, as they did not appear to correspond to previous infringement theories:

15          It appears from the Court's careful review of the proposed SIC [Supplemental
        Infringement Contentions] and the arguments presented at the hearing that Finjan's proposed
16      amendments to identify components are significantly more complex and prejudicial than
        Finjan has portrayed them. . . .  At the hearing, the Court pressed Finjan on its suggestion that
17      it was merely inserting specific names for a previously described functionality. . . .
            Finjan's showing of diligence is insufficient given the apparent significance of its
18      proposed amendment/supplementation which defy redlining its existing contentions.

19  Dkt. 274 at 7.  Judge Freeman maintained that decision:

20      Having reviewed the parties' arguments with respect to the internal code names issue, the
        Court . . . concurs with Judge van Keulen's determination that the issue is more complex than
21      initially presented by Finjan. The Court would have expected Finjan to present a list of newly
        identified internal code names to be swapped out for less precise designations in the
22      infringement contentions. Having been advised of this deficiency by Judge van Keulen,
        Finjan has done nothing to persuade this Court that the true effect of its request is as benign
23      as suggested in the moving papers.

24  7/17/19 Order at 2-3.  Finjan served its expert reports as if it had been granted leave to amend.  Cisco

25  moved to strike, and Judge Freeman rejected Finjan's argument that these theories were not new:

26      Thus, as Finjan recognized, its argument was more properly raised in a motion for leave to
        amend infringement contentions—not after expert reports are served. The problem for Finjan
27      is that it has tried and failed *twice* to amend its infringement contentions to add these
        component names. *See* SVK Order at 7; BLF Order at 2-3. Finjan failed to carry its burden of
28      showing diligence and lack of prejudice. *See Apple Inc. v. Samsung Elecs. Co.*, No. CF 12-

00630 LHK, 2012 WL 5632618, at *2 (N.D. Cal. Nov. 15, 2012) ("The good cause inquiry" considers (1) whether the party seeking leave to amend acted with diligence and (2) whether there would be undue prejudice to the non-moving party). The Court declines to give Finjan a third bite at this apple.

11/12/19 Order at 4 (emphasis in original).  Judge Freeman twice noted that the examples in the briefs confirmed that the codenames did not correspond to previously disclosed theories.  *Id.* at 4, 6.

**B.      Finjan's Amended Reports, MSJ Proceedings and Meet-and-Confer**

On December 13 and 16, Finjan served the Amended Reports.  The question of whether the Amended Reports properly conformed to the Operative Contentions arose at the January 9, 2020 summary judgment hearing, primarily in the context of the '633 Patent.  In the briefing and at the hearing, Finjan relied exclusively on 7 specific items as the alleged MPC, which Finjan alleged were located at the accused sandboxes. Judge Freeman's MSJ Order identified each of these 7 components as the ███████████████████████████████████████ ████████████████████████████ and described the function of each.   MSJ Order at 14-15. She noted that these 7 are "all components of ThreatGrid and ████████████ *Id.*

At the January 9th hearing, Judge Freeman referred to this Court any dispute about whether these 7 items (and, more generally, the Amended Reports) should be struck:

> [Cisco's Counsel]:   . . ████████████ is not in their infringement contentions.  It's not just these other six, ████ is not in there.

> The Court:  So based on my Order they will have to ask Judge Van Keulen to allow a substitution form something from the contentions to got to the jury in place of all of the arguments about ████████████, which they are now using to defeat summary judgment because otherwise they have provided me no evidence.

1/9/20 Trans., 119:20 - 120:11; *see also id.* at 51:19-22.  In an effort to expedite the process, Cisco identified the specific issues to which it objected that are sufficiently material to warrant Court resolution, beginning with an email dated January 30, 2020.  Multiple meet-and-confer sessions ensued, the last of which was on March 5, 2020.  As to the '633 Patent, there were two disagreements during the meet-and-confer.  First, the parties disputed whether the Operative Contentions disclosed *any* theory directed to components of ThreatGrid or ████████████, i.e., a theory in which the alleged MPC is already at the sandbox, as opposed to being transmitted from another device.  Second, the parties disputed whether the 7 specific components were disclosed.

3

Following the meet-and-confers, the Court granted Cisco summary judgment as to 4 of the items: (i) ███████ (ii) ████████████████ (iii) ███; and (iv) ████████ This leaves only 3 components remaining: (i) ████████ (ii) ███████; and (iii) ████████. MSJ Order at 33.

## III.   LEGAL STANDARD

The standard for a motion to strike an expert report based on new theories in a case is set forth in Judge Freeman's Order striking Finjan's original expert reports as follows:

> "Given the purpose behind the patent local rules' disclosure requirements, a party may not use an expert report to introduce new infringement theories [or] new infringing instrumentalities… not disclosed in the parties' infringement contentions …." *Verinata Health, Inc. v. Sequenom, Inc.*, No. C 12-00865 SI, 2014 WL 4100638, at *3 (N.D. Cal. Aug. 20, 2014) (citation omitted). Finjan was, of course, prohibited from including in its expert reports the theories it sought but failed to add to its infringement contentions by the SVK and BLF Orders.

11/12/19 Order (Dkt. No. 397) at 3.  Any infringement theory found in an expert report that finds only vague support in the operative infringement contentions must be struck from the expert report:

> Reading this contention in isolation, it is not clear that DSS intended to limit claim element 1.8 to a sniff subrating code sequence. However, it is in this vagueness that DSS has a problem. What is clear when reading through the Amended PICs is that it is *unclear* whether DSS's contentions refer to both Sniff Mode and Sniff Subrating Mode as infringing modes or to just Sniff Subrating Mode. Bluetooth Sniff Mode is the underlying technology, so it is certainly mentioned throughout the Amended PICs, but there are no specific limitations that refer to Sniff Mode. Without any specific limitations referring to Sniff Mode, the Court cannot construe the contentions as covering both modes…

> Because "[t]he purpose of *Patent Local Rule 3-1* . . . is in fact to be nit-picky, to require a plaintiff to crystalize its theory of the case and patent claims," the Court concludes that the Amended PICs did not put Apple on notice of the theory that the accused products operating in both Bluetooth Sniff Mode and Bluetooth Sniff Subrating Mode infringed the '290 patent. Although to operate in Bluetooth Sniff Subrating Mode, products necessarily must operate in Sniff Mode, this fact alone, without any clear contentions or limitation, is insufficient to put Apple on notice that Sniff Mode is an infringing mode.

*DSS Tech. Mgmt. v. Apple, Inc.,* 2020 U.S. Dist. LEXIS 6177 at *23-25 (N.D. Cal. 1/14/20).

## IV.   FINJAN'S EXPERT REPORT SHOULD BE STRUCK

### A.   Finjan's Ever-Evolving Theory on the '633 Patent

The *Markman* Order in this case provided the following background on the '633 Patent:

> At a high level, some embodiments include a protection engine that resides on a network server and monitors incoming information for executable code. *Id.* at 2:20–3:4. Upon detection of executable code, the protection engine deploys a "mobile protection code" and protection policies to a downloadable-destination. *Id.* col. 3:5–21. At the destination, the Downloadable is executed, typically within a sandboxed environment, and malicious or potentially malicious operations that run or attempt to run are intercepted and neutralized by the mobile protection code according to set protection policies. *See id.* at 3:22–40.

4

7/23/18 Order (Dkt. 134) at 2-3.  The Operative Contentions alleged that MPC is transmitted from other devices (such as a gateway) to a sandbox via an Application Programming Interface ("API").  Finjan realized its theory was not viable because the API (and the files it transmits) cannot be MPC.  Indeed, Judge Freeman rejected an API-based infringement theory in *Blue Coat II*, 283 F. Supp. 3d 839, 871 (N.D. Cal. 2017).  In the summary judgment briefing here, Finjan disclaimed any theory where MPC is sent to the sandbox (e.g., from the AMP Gateway Products), per footnote 6 of the MSJ Order.  Instead, Finjan relied only on the new theory that each of the 7 components were MPC.  The question Judge Freeman referred to this Court is whether Finjan disclosed this theory in the Operative Contentions.  It did not.  There is no accusation that a pre-existing component of a sandbox is MPC, and the words ███████████████████████████ do not appear.

### 1.    Finjan's Operative Infringement Contentions on the '633 Patent

The Operative Contentions asserted that the MPC consists of various items "transmitted" via an API from (i) "AMP Gateway Products" to (ii) a sandbox.  They further alleged that the AMP Gateway Products send to the sandbox the file that was downloaded from the Internet (the "mobile code"), and that the sandbox then executes the MPC together with the mobile code.  The AMP Gateway Products typically are located on the edge of a network, receive incoming files, and, in certain circumstances, send a received file to a sandbox for further analysis. MSJ Order at 2.

Finjan focused on chart C1 from its Operative Contentions in the meet-and-confer.  Cisco will do likewise, and attaches that chart as Exhibit 1.  Cisco respectfully submits that the Court review the contentions for claim 14, spanning from pages 30-39.  Such a review will confirm there is no allegation that something that is already at a sandbox (and never transmitted to it) is MPC. As the Court will see, Finjan explains the relationship between AMP for Networks and ThreatGrid:

> As shown below, Cisco AMP for Networks is a system for computer security which includes an information re-communicator (e.g., network components and proxy software) which receives downloadable-information. Cisco AMP for Networks also uploads an executable to a sandbox environment (e.g., Threat Grid).

*Id*.  Then, Finjan states that MPC is ***transmitted*** from Cisco AMP for Networks to ThreatGrid:

> Cisco AMP for Networks includes a protection agent engine which causes mobile protection code **to be transmitted to the sandbox** based upon the determination that the downloadable-information includes executable code.

5

1    *Id* at 33.  This is repeatedly stated in the element relating to MPC (element 14d, starting on page 35):

2    • "If the code is executable, Cisco AMP for Networks packages information pertaining to the
        executable and information pertaining to tasks and relevant parameters and **transmits it to**
3       **Threat Grid** and/or Talos for further analysis. The code and information pertaining to the task
        and parameters relevant to Threat Grid and/or Talos is the mobile protection code." (*Id.* at 35)
4
5    • "Cisco AMP for Networks contain or connects to a virtual machine/sandbox and configures it to
        mimic a destination device **then transmits it to the analysis environment**, thereby causing
6       mobile protection code to be communicated to at least one information-destination of the
        downloadable-information." (*Id.*)

7    • "Cisco AMP for Networks contain a scheduler which retrieves, from a virtual environment
        component pool, a virtual environment agent for monitoring and detecting code that perform
8       suspicious changes to the operating system and **sends it to the virtual environment**, thereby
        causing mobile protection code to be communicated to at least one information-destination of the
9       downloadable-information."  (*Id.*)

10   • "As shown below, Cisco AMP for Networks will receive downloadable-information. Cisco AMP
        for Networks include components which analyze and detect executable code within the
11      downloadable-information by performing extension analysis, byte detection, Magic byte,
        Libmagic, File Magic, or byte distribution analysis and **provide an option to transmit the**
12      **mobile protection code to a sandbox environment** such as Threat Grid, which causes the
        mobile protection code to be executed in Threat Grid's sandbox." (*Id.*)
13
14   • "As shown below, Cisco AMP for Networks **transmits mobile protection code to a number of**
        **sandboxes** for analysis based upon the determination that the downloadable-information
15      includes executable code, thereby causing the mobile protection code to be executed in Threat
        Grid's sandbox." (*Id.* at 36)

16   • "Cisco AMP for Networks operates with Threat Grid, which includes a virtual machine
        environment known as Glovebox (mobile code executor). Cisco AMP for Networks includes a
17      network interface and transmitter software which **transmits mobile protection code to the**
        **sandbox** based upon the determination that the downloadable-information includes executable
18      code, which will cause the mobile protection code to be executed and thereby detonate the
        malicious code in a safe environment that monitors and intercepts malicious code."  (*Id.*)
19
20          Finally, Finjan labels Chart C3 as a "Cisco ThreatGrid" chart, but it confusingly defines

21   "Cisco ThreatGrid" to include AMP Gateway Products.  Ex. 2 at 1 ("For purposes of this chart,

22   'Cisco Threat Grid are the Cisco Threat Grid appliances and its virtual variations, either alone, or

23   when used in conjunction with the following products, services, or technologies: … Cisco Threat

24   Grid in combination with other Cisco appliance and/or cloud-based products and/or services (such as

25   Cisco AMP for Networks, Cisco AMP for ASA, Cisco AMP for CWS, Cisco AMP for ESA, Cisco

26   AMP for WSA, Cisco AMP for Meraki MX, and Talos technology)").  Stated differently, while

27   Finjan labels Chart C3 as a ThreatGrid-only infringement chart, the allegations quickly morph into

28   allegations that depend on other Cisco appliances, such as AMP.  As a result, the citations are

substantively identical to those just quoted, containing the exact same MPC allegations as the AMP Gateway Cloud product contentions (as set forth above for claim 14) but with Finjan mechanically substituting the term "Cisco Threat Grid" for "AMP for Networks".  *Compare* Ex. 1 (C1) at 5-6 *with* Ex. 2 (C3) at 5 (claim 1), and Ex. 1 (C1) at 34 *with* Ex. 2 (C3) at 37 (claim 14).  Thus, these contentions likewise do not disclose any Cisco Sandbox-only MPC theories.

### 2.   Finjan's Amended Expert Report on Infringement of '633 Patent

The Amended '633 Report alleges that the 7 sandbox components identified in the MSJ Order constitute MPC.  The Amended '633 Report changed the terminology for some of those components. Ex. 3 at ¶¶ 655, 4402, 4486-88.  These changes included the terminology for 2 of the 3 remaining components: ███████ became "script used to emulate certain user action" (*id.* at ¶ 4486); and ███████ became "preset configurations for the sandbox in Talos." (*Id*. at ¶ 4488). Reflecting the moving target, the components identified in the MSJ Order and the Amended '633 Report only partially overlapped with the components Finjan identified in April 2019 when it served a proposed '633 claim chart ("'633 Proposed Supplement") in connection with its unsuccessful motion for leave to amend.  *See generally* Ex. 4 at 43-48 (treatment of element 14d).  That rejected claim chart identified at least 25 new items as MPC for claim 14.  *Id.*  Two of these – including ███████████████ that are the subject of this motion – still found their way into the Amended '633 Report.  Remarkably, ███████████ which is the third item subject to this motion, was not even identified in the proposed claim chart served in April 2019.

### B.   The Court Should Strike the Sandbox-only Theories

### 1.   No "MPC" Theory Involving Components Of A Sandbox

Cisco asks the Court to strike any MPC theory involving existing components of a sandbox, *i.e.*, any items not transmitted to a sandbox.  This covers the three surviving theories, and also ensures that Finjan does not attempt to use DOE to revive the other four components.

In response, Finjan asserts – with the benefit of hindsight – that several phrases in its Operative Contentions could encompass the Amended '633 Report theory.  There are two problems.

<u>First</u>, Finjan has the process backwards.  If this were Finjan's theory when it served its Operative Contentions, Finjan was obligated to express that theory in clear language that would have

provided Cisco unmistakable notice of the theory it was pursuing.  The service of amended expert

reports is not supposed to be an "aha moment" when seemingly random phrases sprinkled through

infringement contentions come together into a cognizable infringement theory for the first time in

the case.  Finjan's effort to debut a new and categorically broader infringement theory long after the

invalidity contention process (and now simply target the basic software and items already resident at

a sandbox, which is prior art functionality) would turn the local patent rules on their head.

   <u>Second</u>, under any standard, Finjan's effort fails. Finjan relies on the following paragraph on

page 35, which states that the MPC is "code and information" (referred to in many ways, including

"virtual environment agent") that AMP for Networks packages with the downloaded file (*i.e.*, the

sample) and transmits to a sandbox, where the MPC and downloaded file are both executed:

> Cisco AMP for Networks meet the recited claim language because Cisco AMP for Networks
> cause a virtual environment agent (mobile protection code) to be executed within the virtual
> environment running Windows operating system, Java Runtime Environment and/or Internet
> Explorer (mobile code executor) at a downloadable-information destination (e.g., Threat Grid
> and/or Talos). Additionally, the virtual environment agent will process one or more operations
> attempted by executable code in the form of exploits (e.g. drive-by downloads or heapspray
> attack) hidden within webpages. Cisco AMP for Networks will determine whether the code is
> executable code. If the code is executable, ***Cisco AMP for Networks packages information
> pertaining to the executable and information pertaining to tasks and relevant parameters
> and transmits it to Threat Grid and/or Talos for further analysis. The code and information
> pertaining to the task and parameters relevant to Threat Grid and/or Talos is the mobile
> protection code.*** This information includes information using RESTful API's, HTTP
> POST commands which run, execute, and/or process a file or URL in a sandbox), parameters
> to run the sample file or URL, a hash of the file, information contained in a ████ which
> includes information regarding the sample or URL (e.g., metadata of the sample, description of
> the sample, indicators of compromise, and/or warnings that the information-destination should
> be aware of). Furthermore, Cisco AMP for Networks creates dynamic security content based
> on the analysis of web traffic that determines executable code. Additionally, Threat Grid may
> also transmit mobile protection code to Talos based on the determination, and vice versa (e.g.,
> Talos may also transmit mobile protection code to Threat Grid), for further analysis.

Ex. 1 (C1) at 35 (emphasis added).  Nothing about this passage discloses that something *already*

*resident* at the sandbox is the MPC.  Any reasonable reading reflects that, while alleged MPC will be

*executed* at a sandbox (which is required because MPC must be "executable"), the MPC was

transmitted from the gateway.  The next paragraph confirms that "Cisco AMP for Networks contain

or connects to a virtual machine/sandbox and configures it to mimic a destination device then

transmits it to the analysis environment, thereby causing mobile protection code to be communicated

to at least one information-destination of the downloadable-information."  This is followed by the litany of paragraphs that all confirm the accused MPC is transmitted to a sandbox, as quoted above.

Against this backdrop, Finjan seizes on two things to recast these contentions.

<u>First</u>, Finjan points to the passage's reference (highlighted in yellow above) to "parameters to run the sample file or URL".  As explained above, the paragraph states that these "parameters" are one of the several examples of the "information pertaining to tasks and relevant parameters" that AMP for Networks **transmits** to the Cisco Sandbox, and thus these parameters are not something already resident at the Cisco Sandbox.  *See id.* ("Cisco AMP for Networks packages information pertaining to the executable and *information pertaining to task and relevant parameters and transmits it* to [the Cisco Sandbox] for further analysis.  The code and *information* pertaining to the task and parameters relevant to Threat Grid and/or Talos is the mobile protection code. ***This information includes*** … parameters to run the sample file or URL…").

<u>Second,</u> Finjan points to the reference to the "virtual environment agent" in the first sentence of the claim 14 passage above as support for its Cisco Sandbox-only MPC theory:  "Cisco AMP for Networks meet the recited claim language because Cisco AMP for Networks **cause a virtual environment agent (mobile protection code) to be executed** within the virtual environment running Windows operating system, Java Runtime Environment and/or Internet Explorer (mobile code executor) at a downloadable-information destination (e.g., Threat Grid and/or Talos)."  Ex. 1 (C1) at 35.  This assertion fares no better.  The sentence says that Cisco AMP for Networks cause the undefined "virtual environment agent" to be *executed* (which is a basic requirement of MPC) – it does not say that the "virtual environment agent" is something that was *already resident* at the sandbox.  To the contrary, the remainder of the paragraph (and, indeed, all of the contentions) explain how this happens, confirming that MPC is transmitted to the sandbox where it is executed:

> If the code is executable, Cisco AMP for Networks packages information pertaining to the executable and information pertaining to tasks and relevant parameters and transmits it to Threat Grid and/or Talos for further analysis. The code and information pertaining to the task and parameters relevant to Threat Grid and/or Talos is the mobile protection code.

Ex. 1 (C1) at 35.  Moreover, the term "virtual environment agent" is an empty placeholder – the term "virtual environment" is meaningless in its generality, and the term "agent" could be anything sent to

9

a virtual environment.  This is reflected by the laundry list of 25 components in the '633 Proposed

Supplement from April 2019, see *supra* § IV.A.2, most of which did not even find their way into the

Amended '633 Report.  Moreover, this would not disclose a standalone infringement theory in any

context, and certainly not in a paragraph that clearly says MPC is packaged with

information/parameters and transmitted by AMP for Networks to Threat Grid, which is the sandbox.

## 2. The Three Surviving Items that Finjan Identified

Even if Finjan could show its Operative Contentions accused something already present at

the sandbox, it did not accuse (using this or any other terminology) any of the following: (i)

████████, (ii) ████████ or (iii) ████████████  None are identified by name or function, and

certainly not as MPC.  The phrase ████████████ did not even make the cut for Finjan's Proposed

Supplement in April of 2019, and is not in the Operative Contentions.  Nor is any analogous

component for ████████  Indeed, ████████ was addressed in the motions to amend, and leave

was denied; there is no reference it in the treatment of claim 14 in the Operative Contentions.

For the other two items ████████████████ the meet-and-confer highlights the lack

of notice in the Operative Contentions.  Finjan asserted that the generic phrase "parameters to run

the sample file or URL" in the Operative Contentions was the notice that it was accusing two

specific components that were already part of the sandboxes: ████████████████  Of

course, "parameters to run the sample file or URL" could be sent from anywhere, and they

encompass the API theory Finjan abandoned.  It does not denote any specificity, and certainly not an

existing component of a sandbox.  Indeed, this is the same generic phrase that Finjan said also

disclosed 3 of the items on which summary judgement was granted: ████████████████

████████████  *See* Ex. 5 (3/6/20 Email from J. Hannah); Ex. 6 (2/27/20 Email from

J. Hannah).  The MSJ Order confirms that the differences between these items matter.  That is, Judge

Freeman analyzed ***individually***, and not as a group, the 7 different MPC items contained in Finjan's

Original '633 Report.  3-20-20 MSJ Order.  The generic and vague recitation of "parameters to run

the sample file or URL" is hardly the specificity required under the local rules to put Cisco on notice

of the ***specific*** infringement theories for these 3 alleged MPC items that survived summary judgment.

These items are so different that Judge Freeman eliminated some as a matter of law.

Dated:  March 27, 2020

Respectfully submitted,

*/s/ Nicole E. Grigg*
Nicole E. Grigg
**DUANE MORRIS LLP**
Email: negrigg@duanemorris.com
D. Stuart Bartow
Email:dsbartow@duanemorris.com
2475 Hanover Street
Palo Alto, CA 94304-1194
Telephone:  650.847.4146
Facsimile:  650.847.4151

L. Norwood Jameson (admitted *pro hac vice*)
Email:  wjameson@duanemorris.com
Matthew C. Gaudet (admitted *pro hac vice*)
Email:  mcgaudet@duanemorris.com
David C. Dotson (admitted *pro hac vice*)
Email:  dcdotson@duanemorris.com
Jennifer H. Forte (admitted *pro hac vice*)
Email:  jhforte@duanemorris.com
1075 Peachtree Street, Ste. 2000
Atlanta, GA  30309
Telephone: 404.253.6900
Facsimile: 404.253.6901

Joseph A. Powers (admitted *pro hac vice*)
Email:  japowers@duanemorris.com
Jarrad M. Gunther (admitted *pro hac vice*)
jmgunther@duanemorris.com
30 South 17th Street
Philadelphia, PA  19103
Telephone: 215.979.1000
Facsimile: 215.979.1020

*Attorneys for Defendant*
CISCO SYSTEMS, INC.

DEFENDANT CISCO SYSTEMS, INC.'S MTN. TO STRIKE AMENDED EXPERT REPORT ON INFRINGEMENT
CASE NO. 5:17-cv-00072-BLF-SVK