# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

FINJAN, INC.,

                Plaintiff,

     v.

CISCO SYSTEMS INC.,

                Defendant.

Case No.  17-cv-00072-BLF

**ORDER ON *DAUBERT* MOTIONS**

[Re: ECF 421, 423, 425, 427, 429, 431]

Plaintiff Finjan, Inc. ("Finjan") brings this patent infringement lawsuit against Defendant Cisco Systems, Inc. ("Cisco"), alleging infringement of five of Finjan's patents directed to computer and network security: U.S. Patent Nos. 6,154,844; 6,804,780; 7,647,633; 8,141,154; and 8,677,494.

Before the Court are the parties' motions to exclude certain opinions of each party's experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Cisco brings five motions to exclude opinions of: (1) Finjan's technical experts Drs. Cole, Mitzenmacher, and Medvidovic at ECF 421; (2) Finjan's corporate governance expert Dr. James Tompkins at ECF 423; (3) Finjan's cost expert Dr. Ricardo Valerdi at ECF 427; (4) Finjan's damages expert Dr. Layne-Farrar at ECF 429; and (5) Finjan's source code expert Dr. Goodrich at ECF 431.   Finjan brings one motion to exclude opinions of (1) Cisco's source code expert Mr. Overby and (2) Cisco's damages expert Dr. Becker.  ECF 425.  The Court heard oral arguments on March 26, 2020 (the "Hearing").

## I.    LEGAL STANDARD

Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589.  In *Kumho Tire Co., Ltd. v. Carmichael*, the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony.  526 U.S. 137, 147 (1999).  The Supreme Court also made clear that the reliability inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Id.* at 153; *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).

"*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) *aff'd*, 131 S. Ct. 2238 (2011).  So long as an expert's methodology is sound and his opinions satisfy the requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's opinion are questions for the jury.  *Micro Chem.*, 317 F.3d at 1392; *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

## II.    DISCUSSION

The parties have each moved to exclude opinions rendered by the other party's technical and economics experts.  The Court addresses the dispute about each expert in turn.

### A.    Cisco's Motions to Exclude

#### 1.    Drs. Cole, Mitzenmacher, and Medvidovic

Cisco moves to exclude the opinions and proposed testimony of Finjan's technical experts, Drs. Cole, Mitzenmacher, and Medvidovic on two areas: (1) Cisco's alleged prior knowledge of Finjan's technology and patents and (2) the incorporation of the general descriptions of Cisco's accused products in the opinion regarding infringement of each claim element.

##### a.   Cisco's alleged prior knowledge of Finjan's technology and patents

In addition to the infringement issues Finjan's technical experts address, each of their reports

1    includes a section related to Cisco's prior knowledge of Finjan's technology and patents.  *See* Cole

2    Report ¶¶ 84-98, ECF 420-3; Mitzenmacher Report ¶¶ 69-81, ECF 420-4; Medvidovic Report ¶¶

3    79-91, ECF 420-5.    Cisco argues that each expert "cites the same documents (including

4    presentations, magazine articles, and email correspondence between the parties), and concludes that

5    'Cisco knew or should have known that it was infringing one or more of Finjan's patents.'"  Cisco's

6    Motion to Exclude the Testimony of Finjan's Experts (Cole, Mitzenmacher, Medvidovic) ("Cisco's

7    Motion Re Technical Experts") at 1-2, ECF 421 (citing Cole Report ¶¶ 84-98; Mitzenmacher Report

8    ¶¶ 69-81; Medvidovic Report, ¶¶ 79-91).  According to Cisco, these opinions "are not based on any

9    scientific, technical, or other specialized knowledge, but are thinly disguised 'willfulness'

10   opinions."  Cisco's Motion Re Technical Experts at 1.

11          Finjan responds that its technical experts "do not testify that Cisco knew it was willfully

12   infringing" but rather "they provide an explanation of the complex technology and patents that

13   Finjan disclosed to Cisco's engineers."  Finjan's Opposition to Cisco's Motion Re Technical Experts

14   ("Opp'n Re Technical Experts") at 1, ECF 458.  Finjan claims that the experts "explained how the

15   2006-2009 presentations discuss the technology of Finjan's products, its competitors' products, and

16   its patents" and that these explanations would "assist the jury in understanding these technical

17   disclosures." *Id.*

18          The Court disagrees with Finjan's characterization of its technical experts' opinions

19   regarding Cisco's knowledge of Finjan's patents and technology.  Had the experts actually provided

20   an explanation of technical documents as suggested by Finjan, such opinions might have assisted

21   the jury; but they did not. The experts appear to merely set forth a high-level timeline of the

22   relationship and communications between the parties and cite to documents produced in this

23   litigation.  Moreover, Finjan's experts explicitly opine that "Cisco knew or should have known that

24   it was infringing one or more of Finjan's patents[.]"  Cole Report ¶ 98; Mitzenmacher Report ¶ 81;

25   Medvidovic Report ¶ 91.  Such speculative testimony regarding Cisco's knowledge is impermissible

26   and not within the purview of technical experts.  *See Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-

27   03999-BLF, 2015 WL 4272870, at *3 (N.D. Cal. July 14, 2015) (excluding Drs. Cole and

28   Medvidovic from testifying on "Defendants' subjective beliefs").

Accordingly, Cisco's motion to exclude the opinions of Drs. Cole, Mitzenmacher, and Medvidovic on Cisco's knowledge of Finjan's patents and technology and the chronology of the parties' relationship and communications is GRANTED.  To the extent Finjan believes its technical experts explained the technical contents of certain documents, Finjan will have some leeway at trial to offer such testimony **only if** (1) the testimony is related to how an engineer would have understood the documents without any reference to Cisco's state of mind and (2) the testimony can be tied back to the experts' disclosures in their reports.

> b. Incorporation of "overview" of accused products in the element-by-element infringement analysis

Each of Finjan's technical expert reports contains a lengthy section where the expert provides an "overview" of the accused technologies.  *See e.g.*, Cole Report ¶¶ 400-484 (describing Talos), ECF 459-8; Mitzenmacher Report ¶¶ 144-198 (describing Cisco's AMP for Meraki MX), ECF 459-10; Medvidovic Report ¶¶ 585-779 (describing Cisco's ThreatGrid technology).  The experts then provide an element-by-element infringement analysis of the asserted claims, in which they incorporate the "overview" sections.  *See e.g.*, Cole Report ¶ 800 ("I incorporate my Overview of the Accused Products and Accused Technologies herein, and in particular the discussions of the accused technologies and functionalities identified below in my analysis and discussion of source code, and in my Overview of Infringement above.").  Cisco seeks to exclude the incorporation of the "overview" section into the element-by-element analysis because such "blanket statements" would "leave the door open for Finjan to amend, enlarge, and adapt its infringement read in the future which is highly prejudicial because it provides no notice on Finjan's specific infringement theories prior to trial."  Motion Re Technical Experts at 3.  Finjan responds that its experts "provided fulsome analyses based on the expert reports in their entirety."  Opp'n Re Technical Experts at 3.

While the Court is mindful of Cisco's concerns regarding the potential for shifting infringement theories at trial, the Court is not persuaded that Cisco's over-inclusive request to exclude all incorporated paragraphs is necessary or proper.  Thus, the Court DENIES as overbroad Cisco's motion to exclude the opinions of Drs. Cole, Mitzenmacher, and Medvidovic regarding the incorporation of the "overview" sections.  That said, the Court will hear specific objections at trial

1    in the event that Finjan's experts present any infringement theories not specifically discussed in their

2    element-by-element infringement analysis.

3    **2. Dr. Tompkins**

4    Cisco moves to exclude the opinions of Finjan's corporate governance expert, Dr. James

5    Tompkins.  Beginning in 2004, Cisco made a series of investments in Finjan.  Second Amended

6    Complaint ¶ 48, ECF 55.  As part of the investment agreement between the parties, Cisco was

7    permitted to send one non-voting representative to all Finjan Board of Directors meetings.  *Id.*  Cisco

8    designated its employee, Yoav Samet, as its board observer.  *Id.* ¶ 49.  The parties appear to agree

9    that the role and responsibilities of a board observer are governed by contract.  Cisco's Motion to

10   Exclude the testimony of Finjan's Expert James Tompkins, Ph.D. ("Tompkins Motion") at 1; ECF

11   480; Finjan's Opposition to Cisco's Motion to Exclude Dr. James Tompkins Ph.D. ("Tompkins

12   Opp'n") at 3, ECF 457.  Also, the parties do not dispute that Mr. Samet was not a director (or a

13   member) of Finjan's Board.  Tompkins Motion at 1; Tompkins Opp'n at 3.

14   Dr. Tompkins provides his expert opinion on (1) the role and responsibilities of a member

15   of a board of directors as well as board operations, (2) Finjan's board operations and its processes

16   during the time period when Cisco was a board observer, and (3) "whether it was reasonable for

17   Finjan to expect the Cisco observer on Finjan's Board to operate in good faith."  Tompkins Report

18   ¶ 1, ECF 422-7.  To that end, after describing generally the roles and responsibilities of a board of

19   directors and the fiduciary duties owed to a company by the members of its board (not applicable to

20   Mr. Samet since he was not a board member), Dr. Tompkins provides a description of Cisco and

21   Finjan's interactions and relationship over the years.  Tompkins Report ¶¶ 10-35.  Dr. Tompkins

22   then opines that "it was reasonable for Finjan to expect the board observer to act in good faith."

23   Tompkins Report ¶ 39.  Then, Dr. Tompkins (who is not an attorney) creates a test for the conditions

24   under which a board observer would be operating in "good faith."  Tompkins Report ¶ 44.

25   Cisco argues that Dr. Tompkins' testimony should be excluded because his "legal test to

26   determine whether Cisco's Board observer acted in 'good faith' and his 'conditions' for finding a

27   'breach of good faith' usurps the role of the Court to instruct the jury on the law."  Tompkins Motion

28   at 3.  Cisco further argues that the rights and obligations of a board observer are fixed by contract,

and cannot be determined by Mr. Tompkins' "test." *Id.* Cisco further objects to Mr. Tompkins' factual summation of the parties' relationship as prejudicial and not properly subject to expert testimony. *Id.* at 4-5. Finjan responds that "Dr. Tompkins uses his specialized experience and expertise in corporate governance to derive his opinions about the conduct Finjan reasonably expected from Cisco's Board observer" and "arrives at his opinions through consideration of the parties' relationship and history[.]" Tompkins Opp'n at 3-4.

Because the role of the board observer is defined by the contract Finjan and Cisco entered into (*see* ECF 422-6 § 2.7), the Court finds that Dr. Tompkins' testimony regarding Finjan's "expectations" regarding the board observer – even if proper – is  irrelevant and will not assist the jury. Moreover, Dr. Tompkins' "good faith test" appears to be an attempt to insert a legal concept (*i.e.*, good faith) into a relationship governed by contract law – which is improper and not within the purview of a corporate governance expert. Accordingly, the Court GRANTS Cisco's motion to exclude Dr. Tompkins' testimony as to Finjan's expectations of the board observer and his "good faith test." Dr. Tompkins may, however, testify generally as to the role of a board observer and how that role differs from that of a board member or director (*e.g.*, a board observer's responsibilities are governed by a contract) as long as his testimony can be tied back to the disclosures in his report.

### 3.  Dr. Valerdi

Pursuant to Federal Rules of Evidence 403, 702, and *Daubert*, Cisco moves to exclude the testimony of Finjan's cost expert Dr. Ricardo Valerdi. Finjan tasked Dr. Valerdi with determining "the cost of developing the following Accused Products: Advanced Malware Protection (AMP), AMP for Endpoint, Outbreak Filters, Talos Security Intelligence (Talos), and ThreatGrid." Valerdi Report at 1, ECF 426-6. For his analysis, he used the allegedly infringing code – identified by Finjan's technical experts – to estimate "what it would cost Cisco to develop these products from scratch, assuming it was able to do so without the benefit of Finjan's Patents-in-Suit." *Id.* Dr. Valerdi estimates that it would have cost Cisco over $1 billion to develop the same software that Finjan accuses of infringement. *Id.* at 30. In turn, Finjan's damages expert, Dr. Layne-Farrar adopts Dr. Valerdi's figures as one of her five damages methodologies. *See* ECF 426-5 ¶¶ 362-365.

Cisco does not challenge Dr. Valerdi's qualifications or his use of SEER-SEM software in

United States District Court
Northern District of California

calculating the cost of developing Cisco's software.  *See generally*, Cisco's Motion to Exclude the Testimony of Finjan's Expert Dr. Ricardo Valerdi ("Valerdi Motion"), ECF 426 (redacted version available at ECF 427).  Instead, Cisco argues that Dr. Valerdi's cost estimate is irrelevant because it provides no evidence as to the costs of writing new software that would result in a non-infringing alternative.  *Id.* at 1.  Finjan responds that because Finjan's technical experts determined that there is "no commercially acceptable alternatives on the market," Dr. Valerdi "estimated the costs Cisco would have incurred based on the functionalities required for a system to meet Cisco's needs that were directly tied to the patented technology."  Finjan's Opposition to Cisco's Motion to Exclude Dr. Ricardo Valerdi ("Valerdi Opp'n") at 2-3, ECF 459-6 (redacted version available at ECF 461).  According to Finjan, Dr. Valerdi "calculated the cost to develop the accused products from scratch based on the lines of infringing source code, which also serves as a proxy for building a comparable non-infringing system."  Valerdi Opp'n at 4.

"Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty."  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983).  Under this method, "[a] price for a hypothetical license may appropriately be based on consideration of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings.'"  *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (affirming damages award that was based, in part, on the costs saved by renting an infringing backhaul structure versus building a non-infringing backhaul structure) (citation omitted).  This "cost savings" method in determining a reasonable royalty compares the difference in cost "between what the defendant did that was infringing with a non-infringing alternative that the defendant could have done."  *Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-CV-00453-RGA, 2020 WL 474650, at *2 (D. Del. Jan. 29, 2020).  With that in mind, it is clear that Finjan's cost estimate does not fit the "cost savings" methodology established by the Federal Circuit.  Finjan's approach (*i.e.*, using the cost estimate of building the infringing system from scratch as "a proxy for building a comparable non- infringing system") is admittedly a novel one.  *See* Valerdi Opp'n at 2; Transcript of the Hearing ("Hr'g Tr.") at 25:1-3, ECF 506.

Two other courts have considered and rejected this methodology.  In *Acceleration Bay*, the

United States District Court
Northern District of California

plaintiff presented an expert damages opinion that relied on "cost savings" opinions by Dr. Valerdi. *Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-CV-00453-RGA, 2019 WL 4194060, at *3 (D. Del. Sept. 4, 2019).  There, as here, Dr. Valerdi "base[d] his estimate of the cost on the number of lines of code in the current [accused products]" and "adopt[ed] the position that [a non-infringing] network does not exist." *Id.* at *3-4.  Judge Andrews excluded Dr. Valerdi's opinion and explained:

> Dr. Valerdi provides no justification as to why developing an alternative network would, in theory, cost exactly the same amount as developing the existing network. Of course, he cannot justify this conclusion because he has no basis in fact for concluding that an alternative network might exist at all.  Indeed, there is no basis in fact to conclude that creation of the infringing network saved Defendant any money over a theoretical alternative.

*Id.* at *4.  Accordingly, Judge Andrews found Dr. Valerdi's opinion was "not an acceptable basis for determining an amount of costs saved by using the accused infringing technology." *Id.*  When plaintiff moved for reconsideration, Judge Andrews further explained that "the cost of writing new software is irrelevant when there is no evidence that the cost of writing new software could result in a non-infringing alternative." *Acceleration Bay*, 2020 WL 474650, at *2.

Similarly, in *Finjan, Inc. v. ESET, LLC*, Dr. Valerdi offered an opinion "employing a computer model to ascertain the cost he estimates that [defendant] incurred to develop and maintain the accused software incorporated into the accused products."  No. 17-CV-183-CAB-BGS, 2019 WL 5212394, at *3-4 (S.D. Cal. Oct. 16, 2019).  Judge Bencivengo excluded Dr. Valerdi's opinion because Dr. Valerdi's model "estimate[d] the cost of developing the existing [infringing] software, not alternative non-infringing software" and therefore "has no relevance to a cost savings analysis." *Id.* at *3.

The Court finds these opinions well-reasoned and similarly concludes that Dr. Valerdi's cost analysis is based not on creating a non-infringing alternative system, but on recreating the accused system.  Because the Federal Circuit's "cost savings" method is based on comparing the difference in cost between the infringing product and a non-infringing alternative, the Court sees no relevance in Dr. Valerdi's estimated actual cost of developing Cisco's allegedly infringing system.  Accordingly, Dr. Valerdi's opinion is of little probative value and would unfairly prejudice Cisco

8

because the over $ 1 billion estimate "cannot help but skew the damages horizon for the jury[.]" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011); *see also* Fed. R. Evid. 403.

In conclusion, the Court GRANTS Cisco's motion to exclude the testimony of Finjan's cost expert Dr. Ricardo Valerdi.

### 4. Dr. Layne-Farrar

Dr. Layne-Farrar, Finjan's damages expert, presents five different damages methodologies – all of which Cisco moves to exclude. *See* Cisco's Motion to Exclude the Testimony of Finjan's Dr. Layne-Farrar ("Layne-Farrar Motion"), ECF 428-3 (redacted version available at ECF 479). First, Cisco points to "an overarching problem with all five methods" based on Dr. Layne-Farrar's presentation of damages figures that are not discounted to reflect the time value of money. *Id.* at 1-2. Cisco then moves to exclude methods 1, 2, 4, and 5 based on "specific methodological failings[.]" *Id.* at 3-9.

### a. Time Value of Money Discount

There is no dispute that all of Finjan's patent license agreements are for upfront, lump sum royalty payments for Finjan's portfolio of patents. *See* Layne-Farrar Report ¶ 282, ECF 428-5. Dr. Layne-Farrar explains:

> [B]ecause of the upfront nature of the payment, lump sum royalties typically entail a discount reflecting the time value of money. That is, receiving a dollar today is worth more than receiving a dollar tomorrow, so the licensor generally offers the licensee a time value of money discount for upfront payments.

Layne-Farrar Report ¶ 274. According to Dr. Layne-Farrar, "Finjan began its license negotiations with an 8%-16% royalty rate, to which discounts were applied for the time value of money and the benefits of other provisions …." Layne-Farrar Report ¶ 282. Dr. Layne-Farrar also acknowledges that both Cisco and Finjan "prefer[] lump sum payments rather than running royalties in a patent license as it gives it certainty about payment." Layne-Farrar Report ¶ 283.

Dr. Layne-Farrar opines, however, that "[g]iven the nature of the relationship between Finjan and Cisco, [she does] not believe a discount would apply in this matter." Layne-Farrar Report ¶ 274. Accordingly, for each of her damages methodologies, Dr. Layne-Farrar presents two damages

United States District Court
Northern District of California

1    figures: one figure discounted for time value of money and another without that discount – the latter

2    being the one she opines is accurate.  *Id.*  Dr. Layne-Farrar's justification for her opinion (*i.e.*, that

3    the time value of money discount does not apply to Finjan and Cisco's hypothetical negotiation) is

4    that "Cisco and Finjan … would have increased the royalty rate, given Cisco's intentional decision

5    to acquire infringing technologies after being both an investor in Finjan and an observer on Finjan's

6    Board of Directors."  *Id.* ¶ 284.  Cisco seeks to exclude Dr. Layne-Farrar's undiscounted figures

7    because her justifications boil down to "a thinly-veiled argument that Cisco is a willful infringer and

8    therefore should be penalized."  Layne-Farrar Motion at 2.

9         Finjan responds that the relationship between the parties is one of the *Georgia-Pacific*

10   Factors and was properly considered by Dr. Layne-Farrar.  Finjan's Opposition to Cisco's Motion

11   to Exclude Dr. Layne-Farrar ("Layne-Farrar Opp'n") at 1-2, ECF 459-4 (redacted version available

12   at ECF 460).  According to Finjan, at the time of hypothetical negotiations, "Cisco was executing

13   on its business mandate to acquire security products by spending over $2.7 billion to acquire the

14   infringing products."  Layne-Farrar Opp'n at 2 (citing Layne-Farrar Report ¶¶ 322, 91-109, ECF

15   459-16).  "Having poured billions of dollars into acquiring the infringing technologies," Finjan

16   argues, "Cisco had to be licensed, and was willing to pay a premium."  Layne-Farrar Opp'n at 2

17   (citing Layne-Farrar Report ¶ 322).  Cisco replies that while the nature of the relationship between

18   the parties heading into the hypothetical negotiation is a fair consideration, "that factor cannot be

19   used as subterfuge to improperly present an argument of willfulness and allege that Cisco knowingly

20   "needed a license to lawfully execute on its acquisitions."  Cisco's Reply Brief in Support of Its

21   Motion to Exclude the Testimony of Finjan's Dr. Layne-Farrar ("Layne-Farrar Reply") at 1, ECF

22   467-4 (redacted version available at ECF 469).

23        The Court agrees with Cisco that Dr. Layne-Farrar's justifications for not applying the time

24   value of money discount is based solely on the assumption that Cisco willfully infringed Finjan's

25   patents.  Dr. Layne-Farrar acknowledges that time value of money discount is intrinsic in the concept

26   of a lump sum payment and one that Finjan generally applies to its license agreements.  *See* Layne-

27   Farrar Report ¶¶ 274, 282.  She further acknowledges that Cisco and Finjan would have preferred a

28   lump sum royalty payment.  *Id.* ¶ 283.  But she provides no basis for nixing the discount other than

the overall relationship between the parties.  And she has █████████████████

██████████████████████████████████████████████████.   Although

considerations of the relationship between the parties are properly accounted for in the damages

analysis, Dr. Layne-Farrar's reliance on Cisco's "intentional decision to acquire infringing

technologies" is misplaced because that opinion goes to proof of willful infringement, not the

measure of damages to be decided by the jury.   Finjan cites to Dr. Layne-Farrar's deposition

testimony and argues that "Finjan does not offer 'time value of money' discounts[.]"  Layne-Farrar

Opp'n at 2 (citing ECF 459-18 at 56:8-57:11; 59:14-60:8).  But the Court is not persuaded by that

testimony because it directly contradicts Dr. Layne-Farrar's report.  *See* Layne-Farrar Report ¶ 282

("Finjan began its license negotiations with an 8%-16% royalty rate, to which ***discounts were***

***applied for the time value of money*** and the benefits of other provisions ██████████████

████████████████████████████████████████████████████.")

(emphasis added).  Having offered no other foundation for this opinion, the Court agrees with Cisco

that Dr. Layne-Farrar's exclusion of the standard time value of money discount is tantamount to a

double-dip for willfulness enhanced damages.  Finjan will have its chance to obtain treble damages

if it proves willfulness.  But that is a task left to the Court, not the jury.

In conclusion, the Court finds that Dr. Layne-Farrar's opinion lacks proper foundation for

concluding that time value of money discount would not have been applied to Cisco and Finjan's

hypothetical negotiations.  Thus, the Court GRANTS Cisco's motion to exclude Dr. Layne-Farrar's

damages figures that do not apply the time value of money discount.

      b.   Royalty Rates

In a separate method, Dr. Layne-Farrar applies a royalty rate to a royalty base apportioned

for the accused products to calculate Finjan's damages.  *See* Layne-Farrar Report ¶ 346, ECF 459-

16.  Cisco seeks to exclude all damages calculations based on this method, challenging the royalty

rate adopted by Dr. Layne-Farrar and her royalty base (including apportionment methods).  *See*

Layne-Farrar Motion at 3-8.

      i.   Dr. Layne-Farrar's Use of 8% and 16% Royalty Rate

There is no dispute that when licensing its patents, Finjan's practice is to begin its

United States District Court
Northern District of California

negotiations with an 8% (for hardware) and 16% (for software) royalty rate, to which it then applies various discounts.  Layne-Farrar Report ¶¶ 282-83, ECF 428-5.  In case of hypothetical negotiations between Finjan and Cisco, however, Dr. Layne-Farrar opines that the parties would have agreed to the 8% and 16% royalty rate without applying any discounts.  Layne-Farrar Report ¶ 320, ECF 459-16.  Cisco argues that Dr. Layne-Farrar's royalty rate should be excluded because she "starts and ends [her analysis] at the 8% and 16% rates" (*i.e.*, the opening offers) and "identifies no evidence that any of Finjan's nearly two dozen licensees actually agreed to these opening offers."  Layne-Farrar Motion at 3, 4.  Finjan responds that the discounts applied in Finjan's other license agreements were "based on facts not present here."  Layne-Farrar Opp'n at 3 (citing Layne-Farrar Report ¶¶ 320-332; 189-266, ECF 459-16).

First, Cisco argues that that "the Federal Circuit has rejected the use of 8 and 16% rates."  Layne-Farrar Motion at 4 (citing *Finjan, Inc. v. Blue Coat Sys., Inc*., 879 F.3d 1299, 1312 (Fed. Cir. 2018)).  The Court agrees with Cisco that, as a general concept, starting and ending the damages analysis with never-accepted opening offers is improper.  *See Blue Coat Sys.*, 879 F.3d at 1312 (Fed. Cir. 2018) ("[Expert's] testimony that an 8–16% royalty rate would be the *current starting point* in licensing negotiations says little about what the parties would have proposed or agreed to in a hypothetical arm's length negotiation[.]").  In her analysis, however, Dr. Layne-Farrar does more.  She analyzes the particular circumstance surrounding Finjan's license agreements with third parties as well as the relationship between the parties and other relevant factors (*e.g.*, third-party valuations of the patents) – and then opines that none of the discounts would apply to Cisco.  *See* Layne-Farrar Report, 320-332; 189-266, ECF 459-16.  Cisco may disagree with Dr. Layne-Farrar's analysis, but because she does not "start and end" her analysis with the opening offers, the Court is not persuaded that her opinion should be rejected under the Federal Circuit's *Blue Coat* opinion.  "What discount rate is appropriate under the specific circumstances of a case is a factual question for the jury."  *Finjan Inc., v. Blue Coat Sys., Inc*., No. 15-cv-03295-BLF, ECF 381 at 3 (N.D. Cal. Oct. 27, 2017).  At trial, Cisco can cross examine Dr. Layne-Farrar on her choice of applying no discounts or offer rebuttal testimony on why discounts should have applied – with the exception of the time value of money discount addressed above.

Second, Cisco challenges Dr. Layne-Farrar's reliance on "economic factors" to support her 8% and 16% rates. Layne-Farrar Motion at 4-5. Cisco argues that Dr. Layne-Farrar may not support an "upward influence" on royalty rates on the basis that "patents have survived validity challenges, and at times Finjan is required to take alleged infringers to court." *Id.* at 4 (citing Layne-Farrar Report ¶ 321). According to Cisco, using this factor is "qualitative double counting" of validity, because validity and infringement are presumed during hypothetical negotiations. While Cisco is correct that when considering the hypothetical negotiations, it is assumed that "the asserted patent claims are valid and infringed," (*Lucent Techns., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)), Cisco provides no authority, and the Court is not aware of any, to support the notion that the parties to a hypothetical negotiation would not have considered the strength of the patents-in-suit.

Finally, Cisco argues that "certain of [Dr. Layne-Farrar's] economic factors are … nothing more than 'willfulness' opinions." Layne-Farrar Mot. at 5. The Court agrees. For example, Dr. Layne-Farrar opines that "Cisco ignored internal warnings that its acquisitions could run afoul of Finjan's patents" and thus "Finjan would not have agreed to accept a lower rate." Layne-Farrar Report ¶ 327. Dr. Layne-Farrar may not rely on allegations that Cisco willfully infringed Finjan's patents to justify higher royalty rates because the entitlement to enhanced damages will be determined by the Court. That said, the Court finds nothing improper in Dr. Layne-Farrar's opinions noting the importance of the accused technology to Cisco's business at the time of hypothetical negotiations (*See e.g.*, Layne-Farrar Report ¶ 322) – as long as she does not rely on any speculative allegations that Cisco knowingly purchased infringing products or otherwise willfully infringed Finjan's patents.

In conclusion, the Court DENIES Cisco's motion to exclude Dr. Layne-Farrar's royalty rate of 8% and 16% when offered in conjunction with her analysis as to factors mitigating against discounts allowed during the hypothetical negotiation. Dr. Layne-Farrar may not, however, testify about Cisco's alleged conduct related to the issue of willful infringement. This ruling is separate from the time value of money discount ruling above.

ii.   Dr. Layne-Farrar's Royalty Base

Next, Cisco seeks to exclude Dr. Layne-Farrar's royalty base as to the accused products (1) ThreatGrid and Outbreak Filters and (2) Advanced Malware Protection ("AMP").

**ThreatGrid and Outbreak Filters.**   Cisco argues that Dr. Layne-Farrar undertakes no apportionment as to ThreatGrid and Outbreak Filters (both multi-component products) and that her "failure to apportion is a quintessential methodological flaw." Layne-Farrar Motion at 5. Cisco points to deposition transcripts of Dr. Layne-Farrar and Finjan's technical experts to argue that some of the functionalities in Cisco's products are not accused of infringement and thus should not be included in damages calculations. *Id.* Finjan responds that Dr. Layne-Farrar (1) apportions the sales of Outbreak Filter subscriptions when they are sold in a bundle that includes non-accused software and (2) properly relies on the conclusions of Finjan's technical experts that ThreatGrid and Outbreak Filters infringe in their entirety.

It is well understood that "to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). The Court is satisfied that in this case, Dr. Layne-Farrar has apportioned the sale of ThreatGrid and Outbreak Filters by properly relying on Finjan's technical expert's opinion that "the accused functionality comprises the entirety of those products." Layne-Farrar Report ¶ 342, ECF 459-16. Cisco's challenges appear to be directed at Finjan's technical experts' opinion that ThreatGrid and Outbreak Filters infringe in their entirety – not to Dr. Layne-Farrar's apportionment methodology. The parties' technical experts are free to battle the scope of infringement at trial, but that dispute is not a basis for excluding the damages expert's opinion for lack of apportionment.

Accordingly, the Court DENIES Cisco's motion to exclude Dr. Layne-Farrar's royalty base as to ThreatGrid and Outbreak Filters.

**AMP.** Cisco challenges two alternative apportionment methods Dr. Layne-Farrar adopts for AMP: (1) the eight-feature apportionment method and (2) infringing code apportionment method. Layne-Farrar Motion at 6-8.

In the "eight-feature apportionment" method, Dr. Layne-Farrar relies on Finjan's technical

experts who identify eight features in the AMP and assign each feature equal weight. Layne-Farrar Report ¶ 340. First, Cisco argues that Finjan's technical experts "cherry picked an internal draft document" that identifies "eight features of AMP at a high level" instead of "other documents and testimony" that purportedly "contradict the *ipse dixit* conclusion that AMP has only eight features and that these features are equally valuable." Layne-Farrar Motion at 6. Second, Cisco argues that even if AMP had only eight features of equal value, Dr. Layne-Farrar's opinions should be excluded because "she assumes, without any support, that if a patent relates to a feature, Finjan is entitled to 100% of the value of that feature." *Id.* at 7. In other words, Cisco believes that further apportionment of the features are required.

First, Dr. Layne-Farrar properly relied on Finjan's technical experts' opinion that AMP has eight features of equal value. Disputes on the factual underpinnings of an expert's analysis go to its weight, not admissibility. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Any dispute as to the factual support may properly be addressed during cross-examination. Second, the Court is satisfied that Dr. Layne-Farrar properly apportioned the accused product to the infringing features. It is true that "a patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). Here, however, Dr. Layne-Farrar properly relied on Finjan's technical experts who opined that "[s]ince these features correspond to security offerings that are part of a multi-layered, holistic approach to cybersecurity these features are interrelated and often mutually dependent." Layne-Farrar Report ¶ 340. While Cisco argues that one of eight features (file analysis) "preexisted Finjan's patents" and therefore could not have been infringing, such factual disputes can properly be addressed at trial. *See* Layne-Farrar Reply at 4. In sum, the Court DENIES Cisco's motion to exclude Dr. Layne-Farrar's "eight-feature apportionment method" for AMP.

In the alternative "infringing code apportionment" method, Dr. Layne-Farrar relies on the opinion of Finjan's source code expert, Dr. Goodrich, who calculated the percentage of infringing

United States District Court
Northern District of California

source code versus non-infringing source code found in the accused products.  Layne-Farrar Report ¶¶ 344-345.  Dr. Layne-Farrar uses Dr. Goodrich's "percentages of infringing code" directly as an apportionment method.

The Court is not persuaded that source code line counting, on its own, is an economically sound approach to apportion a revenue base.  Dr. Layne-Farrar relies on Dr. Goodrich's "apportionment percentages," in which he simply compares the number of allegedly infringing lines of code to the total lines of code.  *See* Layne-Farrar ¶ 345.  The quantity of lines of source code attributed to an infringing feature – as large as that might be – does not necessarily portray the accused feature's value contribution to the end product.  While the Federal Circuit has allowed consideration of percentage of source code attributable to each accused feature in the apportionment analysis, it has noted that the method "cannot be reduced to a mere counting of lines of code[.]"  *Lucent Techs.*, 580 F.3d at 1332–33.  In other words, Dr. Layne-Farrar cannot apportion the amount of damages based solely on the number of lines of infringing code, unless she provides an economic analysis that demonstrates the value of the infringing feature in the overall product – and she has not done so here.  *See* Layne-Farrar Report ¶ 345 ("I use the percentages of infringing code calculated by Dr. Goodrich as another method to apportion the revenues of the infringing products in my damages calculations.").  In addition, this line-counting apportionment method is incapable of taking into account the life of the patents-in-suit that expire (or have expired) years apart.  Accordingly, the Court GRANTS Cisco's motion to exclude Dr. Layne-Farrar's "infringing code apportionment method" for AMP.

### c.  Price per Scan

Cisco seeks to exclude Dr. Layne-Farrar's "price per scan" method on the ground that she "cites no evidence that Finjan was utilizing such a construct at the time of the hypothetical negotiation, that Cisco ever entered into a patent license on this basis, or that Cisco would have contemplated this alternative means of valuing the patents' contribution to ThreatGrid."  Layne-Farrar Motion at 9.  Finjan responds that Dr. Layne-Farrar's opinion is not "evidence-free" because she "estimated the reasonable royalty for ThreatGrid based on information that Cisco used to determine the extent of use of the patented technology at the time that Cisco acquired the technology

from a third-party and the value that Cisco placed on acquiring such technology." Layne-Farrar Opp'n at 7-8 (citing Layne-Farrar Report ¶¶ 354-59).  Dr. Layne-Farrar opines that "Cisco prices its Threat Grid products in terms of the number of submissions and accounts for submission limits in its product offerings." Layne-Farrar Report ¶ 354; *see also id.* ¶ 355 (citing documents produced in this case as evidence of the price and cost per security scan).

Cisco has not cited to any authority, and the Court is not aware of any, that a "price per scan" methodology is unsound because a patentee has not executed an agreement on that basis.  The Court fails to see an inherent flaw in a method that takes into account how an accused infringer prices its products.  Accordingly, Cisco's motion to exclude Dr. Layne-Farrar's "price per scan" method is DENIED.

### d.  Dr. Valerdi's Cost Estimates

Cisco seeks to exclude Dr. Layne-Farrar's reliance on Dr. Valerdi's cost estimates.  Layne-Farrar Motion at 9.  Because the Court has granted Cisco's motion to exclude Dr. Valerdi's cost estimate opinion, Cisco's motion to exclude Dr. Layne-Farrar's damages opinion based on Dr. Valerdi's cost estimates is GRANTED.

### 5.  Dr. Goodrich

Cisco moves to (1) exclude the opinions of Finjan's source code expert, Dr. Goodrich and (2) strike those portions of the reports of Drs. Eric Cole, Michael Mitzenmacher, and Nenad Medvidovic tied to Dr. Goodrich's opinions.  Cisco's Motion to Exclude the Testimony of Finjan's Expert, Dr. Goodrich ("Goodrich Motion") at 1, ECF 430-4 (redacted version available at ECF 431).

Finjan's technical experts on infringement, Drs. Mitzenmacher, Cole, and Medvidovic— each opining on different patents and different accused features— identified a set of identical source code file folders as allegedly containing infringing source code.  *See* Mitzenmacher Report ¶ 816, ECF 430-6; Cole Report ¶¶ 35, 36, ECF 430-7; Medvidovic Report ¶¶ 806, 807, ECF 430-8.  Cisco argues that "this list of file folders is not accompanied by any opinions as to how or why the files in these directories infringe" and "there is no distinguishing of which directories relate to which patents."  Goodrich Motion at 1-2.   According to Cisco, "[e]ach of Finjan's infringement reports specifically cite to a tiny percentage of the accused products' source code in their limitation-by-

1    limitation analysis." *Id.* at 4.  Cisco seeks to exclude Dr. Goodrich's opinions because "they are not

2    based on sufficient facts or data, and they are not the product of reliable principles and methods."

3    *Id.*   Finjan responds that "[e]ach of the experts reviewed Cisco's source code on numerous

4    occasions, both separately and together with Dr. Goodrich" and "identified which specific source

5    code directories for each product contained infringing code, and communicated that to Dr.

6    Goodrich."  Finjan's Opposition to Cisco's Motion to Exclude Dr. Michael Goodrich ("Goodrich

7    Opp'n") at 2, ECF 456.

8        In the Court's view, the dispute presented in this motion is not about the method Dr.

9    Goodrich used to count the lines of infringing code, but instead, Cisco is challenging Finjan's

10   technical experts' identification of the allegedly infringing code.  While the Court acknowledges

11   that the identification of an identical set of source code folders as infringing code for different

12   patents and different accused features is a curious issue Finjan's experts might have to explain at

13   trial, evaluating the weight of those experts' opinions is up to the fact finder.  Based on the current

14   record, Finjan's technical experts reviewed Cisco's source code and identified certain source code

15   folders as infringing.  Dr. Goodrich properly relied on those opinions and counted the lines of code.

16   Accordingly, the Court DENIES Cisco's motion to exclude Dr. Goodrich's opinion and DENIES

17   Cisco's motion to strike those portions of the reports of Drs. Cole, Mitzenmacher, and Medvidovic

18   tied to Dr. Goodrich's opinions.  If the jury finds infringement of only some of the asserted claims,

19   Finjan will have to demonstrate that there was substantial evidence to support the verdict.  But that

20   is a problem for another day.

21       **B.    Finjan's Motion to Exclude**

22          **1.  Mr. Overby**

23       Mr. Overby submitted a rebuttal report (to Dr. Goodrich's) counting the number of lines of

24   allegedly infringing source code.  Mr. Overby simply counted the number of lines of code

25   specifically identified in Finjan's technical experts' infringement reports.  *See* Finjan's Motion to

26   Exclude Opinions of Cisco's Experts Mr. Overby and Dr. Becker ("Finjan Motion") at 3, ECF 424-

27   4 (redacted version available at ECF 425); Overby Report ¶ 23, ECF 424-6.  Finjan argues that Mr.

28   Overby's opinion is unreliable on two grounds: (1) Mr. Overby relied on hearsay information from

United States District Court
Northern District of California

18

United States District Court
Northern District of California

1  a Cisco employee (instead of technical experts) and (2) Mr. Overby used his "instincts" to treat one

2  software language, Clojure, as another software language, Python.  *Id.*

3      As an initial matter, it appears that Mr. Overby employed the same method (or equation) Dr.

4  Goodrich used (Lines of Infringing Code ÷ Total Lines of Code = % of Infringing Code) – the only

5  difference being that to calculate the numerator (*i.e.*, lines of infringing code), Dr. Goodrich counted

6  all of the lines of code in the source code file directories identified by Finjan's technical experts,

7  while Mr. Overby only counted the lines of code specifically identified in Finjan's technical experts'

8  element-by-element infringement analysis.  *See* Finjan Motion at 2, 5; s*ee also* Overby Report ¶ 23.

9  Finjan argues that "Mr. Overby subjectively ignored millions of lines of code Finjan's experts cited

10  in their reports as infringing code without attempting to conduct or rely on any expert analysis of

11  the code."  Finjan Motion at 5.  Cisco responds that Mr. Overby "took a different approach" than

12  Dr. Goodrich by only counting "the lines of code actually cited to and relied upon by Finjan's experts

13  in their element-by-element analysis."  Cisco's Opposition to Finjan's *Daubert* Motion ("Cisco

14  Opp'n") at 10-11, ECF 453-3 (redacted version available at ECF 454).  The Court finds that the

15  factual basis for the experts' opinion (*i.e.*, which lines of source code are infringing) is a matter for

16  the jury and not a dispute about expert methodology.

17      Similarly, the Court is not persuaded that Mr. Overby's reliance on the information he

18  received from Cisco's employee (Mr. Buck) justifies exclusion of his opinions.  In rebutting Dr.

19  Goodrich's opinion, Mr. Overby relied on statements from Mr. Buck—Cisco's corporate

20  representative on the AMP Cloud and AMP for Endpoints source code—to explain that Dr.

21  Goodrich, in Mr. Overby's opinion, was mistaken in calculating the total number of lines of code

22  for each product (the denominator).  After pointing out that "error", however, Mr. Overby goes on

23  to state that "in an effort to conduct an apples-to-apples comparison, for each product category I

24  have assumed that Dr. Goodrich's calculations regarding the sum of C-equivalent lines of code in

25  each product category (as set forth in Goodrich Exhibit E) are correct."  Overby Report ¶ 22.  Cisco

26  argues that it will utilize Mr. Overby's opinion regarding Dr. Goodrich's "error" to cross-examine

27  Dr. Goodrich but notes that Finjan's arguments regarding Mr. Buck's statements are a "red herring"

28  because those statements did not impact Mr. Overby's calculations.

The Court finds that Mr. Overby's reliance on Mr. Buck's statements is not a proper basis for excluding Mr. Overby's opinions for two reasons: (1) Mr. Overby properly relied on Mr. Buck's statements because Mr. Buck was identified as a fact witness for Cisco—knowledgeable on AMP source code—and he provided Mr. Overby with factual information about the contents of the AMP source code directories at issue in this case and (2) Mr. Overby did not rely on Mr. Buck's statements when he calculated the total number of lines per product.  Moreover, experts are "permitted to rely on hearsay evidence in coming to their conclusions, so long as an expert in the field would reasonably rely on that information." *Interwoven, Inc. v. Vertical Computer Sys.*, No. CV 10-04645 RS, 2013 WL 3786633, at *7 (N.D. Cal. July 18, 2013).  My. Overby's reliance on Cisco's corporate witness about the contents of the AMP source code directories was reasonable.

Finally, Finjan's concerns regarding Mr. Overby's reliance on his "instincts" to treat one source code language (Clojure) as another language (Python) for purposes of converting it to C language can properly be addressed during cross examination.  Cisco argues that Mr. Overby in fact was "relying on his decades-plus experience in the computer software arena, therefore opined that Clojure was akin to Python for purposes of converting to the C language, and explained why he came to that conclusion."  Cisco's Opp'n at 15.  While the Court recognizes that Mr. Overby's choice of words in his deposition was unfortunate, Finjan will have the opportunity to cross-examine Mr. Overby to test the validity of his opinions.  Accordingly, the Court DENIES Finjan's Motion to exclude Mr. Overby's opinions.

### 2.  Dr. Becker

Dr. Becker's expert report on damages was submitted as a rebuttal to Dr. Layne-Farrar's report.  Dr. Becker utilizes two methods to determine "effective royalty rate" based on (1) Finjan's license agreements with its licensees and (2) add-on revenue provisions present in some of Finjan's license agreements.  *See* Becker Report ¶¶ 300-301, ECF 424-14.  Dr. Becker then reduces the "baseline effective royalty rate" to determine a per-patent rate, by dividing the "baseline effective royalty rate" by the total number of patents that Finjan has asserted in other litigation.  Becker Report ¶¶ 324-25.

United States District Court
Northern District of California

a.   Effective Royalty Rate Based on Monetary Settlement Offers

Finjan moves to exclude Dr. Becker's calculation of an "effective royalty rate" based on monetary settlement offers made.  Finjan Motion at 8-13.  According to Finjan, "[r]ather than rely on the fees and royalty provisions set forth in the actual license agreements, Dr. Becker plucked numbers from settlement offers to potential Finjan's licensees prior to the final executed agreement between the parties."  *Id.* at 8.  Dr. Becker's opinions based on such offers, Finjan argues, are both inadmissible and unreliable.  *Id.*

i.   Admissibility under Federal Rule of Evidence 408

First, Finjan argues that settlement offers and negotiations are inadmissible under Federal Rule of Evidence 408.  Finjan Motion at 9; *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("Federal Rule of Evidence 408 specifically prohibits the admission of settlement offers and negotiations offered to prove the amount of damages owed on a claim").  This is because Dr. Becker relies on "settlement offers and discussions between Finjan and potential licensees in the context of settling a litigation or coming to an agreement for a license prior to the filing of a lawsuit."  Finjan Motion at 9 (citing Becker Report ¶¶ 181-187, 202-216, 243, 270-288, 306).

Cisco responds that ███████████████████████, Dr. Becker "looks at the entirety of the negotiation process for the agreements that Finjan has actually executed to ascertain the effective rates Finjan ultimately agreed to."  Cisco Opp'n at 2.  The Court recognizes that due to the ████████ nature of Finjan's license agreements, the damages experts might be required to look to the negotiations in order to ascertain the royalty rate the parties eventually finalized.  That said, the unaccepted settlement offers and discussions between Finjan and third-party licensees are irrelevant and inadmissible.  Thus, Dr. Becker may use the settlement discussions only to the extent that they assist the fact finder to understand the royalty rate associated with the ███████████ in the executed license agreements. To the extent that Dr. Becker's royalty rate opinions are based on presumed maximum or minimum rates only reflected in the interim discussions, they are precluded.

Cisco further argues that because Finjan's damages expert (Dr. Layne-Farrar) relies on

Finjan's standard opening offer in licensing negotiations (8% and 16%), it is only fair that Cisco gets to present the "subsequent communications that led to the actual agreement." Cisco Opp'n at 3. There is no dispute that Finjan begins its license negotiations with an 8% and 16% royalty rate, to which various discounts are applied through negotiations. *See* Layne-Farrar Report ¶¶ 282-83, ECF 475-9. However, that practice is not limited to settlement discussions – but generally applies "across both arms' length and litigation settlement agreements." Layne-Farrar Report ¶ 282; *see also* Hr'g Tr. at 68:1-2. Finjan's general practice of opening all licensing negotiations with 8% and 16% royalty rate, irrespective of pending litigation, is not subject to Rule 408 prohibitions. In contrast, in some of his opinions, Dr. Becker recites the entire negotiation history between Finjan and its licensees, including many interim offers – which are inadmissible under Rule 408. *See e.g.*, Becker Report ¶ 187 (███████████████████████); *see also Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 435, 445 (D. Del. 2007) (finding that the terms of prior settlement negotiations or proposals are not allowed under Rule 408). Thus, the Court is not persuaded that Dr. Layne-Farrar's use of the 8% and 16% starting offers opens the door and makes the entire negotiation process fair game.

Accordingly, the Court finds that Dr. Becker's opinions relying on the settlement offers and negotiations are inadmissible, with the limited exception of when those discussions are required to ascertain the royalty rate finalized in the executed licenses.

ii.    Reliability

Second, Finjan argues that Dr. Becker "cherry picked" offers from settlement negotiations and "did nothing to account for the economic and technological differences between those settlement licensing negotiations and what would occur in a hypothetical negotiation between Finjan and Cisco." *Id.* at 9-10.

The Court is persuaded that Dr. Becker has sufficiently accounted for the economic and technological differences between Finjan's settlement licensing agreements with third parties and what would occur in a hypothetical negotiation between Finjan and Cisco. Dr. Becker relies on agreements in which Finjan licensed the ***patents-in-suit*** to companies in the cybersecurity industry, where many of these companies are ***direct competitors*** of Cisco or its products. *See* Becker Report

¶ 295, ECF 424-14. Further, Dr. Becker accounted for certain unique circumstances present in those agreements. *See* Becker Report ¶¶ 312, 424-14. Any dispute as to Dr. Becker's determinations regarding specific license agreements (*e.g.*, the ████████████████ agreements) can be addressed through cross-examination at trial.

Finjan also argues that Dr. Becker's opinions are arbitrary because he "acknowledged that all of the offers he relied on were within two to six years after the hypothetical negotiation but claimed that those dates did not impact his opinion." Finjan Motion at 12 (citing Becker Report ¶¶ 122, 296, 300-301; Becker Depo. Tr. at 176:22-177:4, ECF 424-22). Cisco responds that "[b]oth parties' experts have looked to Finjan's long history of license agreements and identified those agreements that each believes is most relevant for purposes of determining what the parties would have agreed to at the hypothetical negotiation." Cisco Opp'n at 5-6 (citing Layne-Farrar Report ¶¶ 285-313, ECF 453-7 (discussing license agreements between 2012 and 2018)). The Court agrees with Cisco that both experts analyzed a number of Finjan's license agreements over the years and opined as to their relevance to a hypothetical negotiations between Finjan and Cisco. Looking at Finjan's licensing history to determine what the parties would have agreed to, on its own, does not make Dr. Becker's method unreliable or arbitrary.

In conclusion, the Court GRANTS Finjan's motion to exclude Dr. Becker's opinion regarding the effective royalty rate based on settlement offers and negotiations, except where the settlement discussions are required to ascertain the royalty rate finalized in the executed licenses.

### b. Effective Royalty Rate and Add-On Revenue Provisions

Several of Finjan's agreements "████████████████████████████ ████████████████████████████████████████████ ██████████████████████." Becker Report ¶ 313, ECF 453-5. In Dr. Becker's opinion, ██████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████" *Id.* In the ██████████ license agreement, for example, ████████████ ████████████████████████████████████████████ ████████████████████████████████████████ Becker

1    Report ¶ 317.  Dr. Becker sees these provisions as a "███████████████████████████

2    █████████████████████████████████████████████████████████."  *Id.*

3    (emphasis in original).  Accordingly, Dr. Becker opines that the "████████████████████

4    ██████████████████████████████████████████████████████████████

5    ████████████████████."  *Id.*  Dr. Becker then relies on a statement from "Finjan's

6    corporate representative on licensing" to assert that "███████████████████████████

7    █████████████████████████████"  *Id.* ¶ 318.  Accordingly, Dr. Becker divides the

8    "add on" royalty rate ███████ by 5, to arrive at an "effective" royalty rate ███████  *See id.*

9         Finjan argues that Dr. Becker's methodology is "flawed" because "he did not explain why

10   (1) dividing a royalty rate by number of years is an appropriate way to determine an effective royalty

11   rate or (2) that five years is the appropriate denominator."  Finjan Motion at 14.  While recognizing

12   that "[w]hen negotiating the upfront payment for a license, Finjan looks at ████████████████

13   ████████████████"  Finjan argues that "Dr. Becker does not explain why this practice

14   applies to the acquisition royalty provision that requires additional royalties on top of the upfront

15   payment."  *Id.*  Cisco responds that dividing the royalty rate by five "represents a very conservative

16   calculation" because the remaining life of the patents are  generally longer than five years (in the

17   case of the Trend Micro license, 12 years) making the "effective" royalty rate even lower.  Cisco

18   Opp'n at 8-9.  Finjan replies that "there is no economic doctrine that suggests one can just divide a

19   rate by years" or that Finjan or Cisco ever calculated a royalty rate by multiplying it by the number

20   of years of life in a patent term.  Finjan's Reply Brief in Support of Motion to Exclude Opinions of

21   Cisco's Experts Mr. Overby and Dr. Becker ("Finjan Reply") at 6, ECF 475-3 (redacted version

22   available at ECF 476).

23        The Court is persuaded that Dr. Becker has offered reasons for his analysis – and Finjan is

24   free to challenge those reasons during cross examination.  Dr. Becker opines that the "add on"

25   provisions in Finjan's agreements are a "███████████████████████████████████████

26   ████████████████████████████████."  Becker Report ¶ 317.

27   The Court sees no inherent flaw in this approach.  Dr. Becker also explains what he characterizes as

28   a "conservative" method in choosing to rely on the first five years of the license grant to make his

United States District Court
Northern District of California

1    calculations. *Id.* ¶ 318. Finjan's challenge to the factual basis of Dr. Becker's opinion may properly

2    be addressed at trial. Accordingly, the Court DENIES Finjan's motion to exclude Dr. Becker's

3    opinion regarding the effective royalty rate in the "add on" provisions.

4                    c.   Apportionment of Baseline Royalty Rate

5          Dr. Becker further apportioned the "effective" royalty rate by dividing the rate by 23, the

6    number of different patents Finjan has asserted against accused infringers in the cybersecurity space.

7    Becker Report ¶¶ 455-56. Dr. Becker also, as a "highly conservative" alternative, divided the

8    royalty rate by 5, the number of patents Finjan has asserted against Cisco. Becker Report ¶ 458.

9    Finjan argues that this methodology is "arbitrary" because depending on whether Dr. Becker used

10   23 patents or 5 patents, the resulting rates have a five-fold difference. Finjan Motion at 15.

11   According to Finjan, it did not assert 23 patents in lawsuits against other companies in 2012-2013 –

12   the date of the hypothetical negotiations between Finjan and Cisco. In addition, Finjan argues that

13   Dr. Becker's opinion lacks proper foundation that Finjan's patents are equally valued because "his

14   reliance on statements in an SEC filing or by company employees regarding how each of Finjan's

15   patents are core to Finjan's business does not support division of a royalty rate by a number of

16   patents." *Id.*

17         The Court is persuaded that Dr. Becker has established proper foundation for his opinion

18   that Finjan treats the patents in its portfolio as having equal value. *See* Becker Report ¶ 437 & n.

19   744 (citing testimony of Finjan's witnesses and other documents); *id.* ¶ 454 (same); *see also Finjan,*

20   *Inc. v. Blue Coat Sys., Inc.*, 2015 WL 4272870, at *7 ("[Expert] could reasonably rely on the

21   testimony of Plaintiff's own witness that the patents Plaintiff has asserted in litigation are 'core' and

22   thus equally valued[.]"). That said, the Court concludes that Dr. Becker has not laid proper

23   foundation to establish that Finjan asserted 23 patents at the time of hypothetical negotiations. Dr.

24   Becker notes that "[a]s of October 2013, Finjan's portfolio consisted of 29 issued United States

25   Patents." Becker Report ¶ 452. Dr. Becker also states that "Finjan has asserted 23 different patents

26   against accused infringers in the cybersecurity space." *Id.* ¶ 440 & n. 747 (citing to numerous

27   lawsuits from 2006 to 2018). But Dr. Becker provides no analysis as to why 23 patents (out of 28)

28   would have been considered Finjan's "entire portfolio" for the purposes of hypothetical negotiations

United States District Court
Northern District of California

with Cisco ***in the hypothetical negotiation timeframe***.

For his alternative method, however, Dr. Becker "assume[s] that the total portfolio of patents that Finjan would consider relevant to Cisco is 5 patents" based on the five patents Finjan has asserted against Cisco in this action.  Becker Report ¶ 458.  Finjan fails to articulate a reason why dividing the royalty rate by the number of patents actually asserted in this litigation is arbitrary or methodologically flawed.   Accordingly, the Court GRANTS Finjan's motion to exclude Dr. Becker's apportionment of baseline royalty rate by 23 patents but DENIES Finjan's motion as to apportionment by 5 patents.

## III.    ORDER

For the foregoing reasons:

(1) Cisco's motion to exclude the opinions of Finjan's technical experts Drs. Cole, Mitzenmacher, and Medvidovic at ECF 421 is (a) GRANTED as to Cisco's knowledge of Finjan's patents and technology and (b) DENIED as to the incorporation of "overview" materials into the element-by-element infringement analysis.

(2) Cisco's motion to exclude the opinions Finjan's corporate governance expert Dr. James Tompkins at ECF 423 is GRANTED with a limited exception for testimony about the general role and responsibilities of a board observer.

(3) Cisco's motion to exclude the opinions of Finjan's cost expert Dr. Ricardo Valerdi at ECF 427 is GRANTED.

(4) Cisco's motion to exclude the opinion of Finjan's damages expert Dr. Layne-Farrar at ECF 429 is (a) GRANTED as to damages figures that do not apply the time value of money discount; (b) DENIED as to royalty rate of 8% and 16% when offered in conjunction with her analysis as to factors mitigating against discounts (other than time value of money discount) allowed during the hypothetical negotiation, with the exception that Dr. Layne-Farrar may not testify about Cisco's conduct related to allegations of willful infringement; (c) DENIED as to royalty base for ThreatGrid and Outbreak Filters; (d) DENIED as to royalty base for AMP based on the eight-feature apportionment method; (e) GRANTED as to royalty base for AMP based on infringing code

apportionment method; (f) DENIED as to the price-per-scan method; and (g) GRANTED as to the method relying on Dr. Valerdi's cost estimates.

(5) Cisco's motion to exclude the opinions of Finjan's damages expert Dr. Goodrich at ECF 431 is DENIED.

(6) Finjan's motion to exclude the opinions of Cisco's expert Mr. Overby at ECF 425 is DENIED.

(7) Finjan's motion to exclude the opinions of Cisco's damages expert Dr. Becker at ECF 425 is (a) GRANTED as to the effective royalty rate based on settlement offers and negotiations, except where the settlement discussions are required to ascertain the royalty rate finalized in the executed licenses and (b) GRANTED as to the apportionment of baseline royalty rate by 23 patents but DENIED as to apportionment by 5 patents.

**IT IS SO ORDERED.**

Dated: April 17, 2020

BETH LABSON FREEMAN
United States District Judge